**Phillip A. BISHOP, Plaintiff,**

v.

**Aaron M. ARONOV, Winton M. Blount, O.H. Delchamps, Jr., Sandral Hullett, Guy Hunt, William Henry Mitchell, John T. Oliver, Jr., Thomas E. Rast, Yetta G. Samford, Jr., Martha H. Simms, Wayne Teague, Cleophus Thomas, Jr., George S. Shirley, Cordell Wynn, all in their official capacities as members of the Board of Trustees of the University of Alabama, Defendants.**

**Civ. A. No. 88–G–1591–S.**

United States District Court, N.D. Alabama, S.D.

Feb. 26, 1990.

Albert L. Jordan, R. Dale Wallace, Jr., William S. Brewbaker, III, Timothy S. Ritchie, Wallace Brooke & Byers, Birmingham, Ala., for plaintiff.

Kenneth L. Goodwin, Paul E. Skidmore, and Stanley J. Murphy, University of Alabama System Office of Counsel, Tuscaloosa, Ala., for defendants.

## MEMORANDUM OPINION

GUIN, District Judge.

In the case at bar the court has been asked to decide whether there has been a violation of the Establishment Clause of the Constitution, set forth below, in light of the actions of both the plaintiff and the defendants [hereinafter the University]:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof: or abridging the freedom of speech ...

Plaintiff Phillip A. Bishop has been employed as assistant professor in the Area of Health, Physical Education, and Recreation, in the College of Education at the University of Alabama and Director of its Human Performance Laboratory since 1984. He teaches exercise physiology, his specialty, to graduate and undergraduate students and supervises research problems and theses.

During the fall of 1984 through the spring of 1987 Dr. Bishop occasionally referred to his religious beliefs during instructional time, remarks which he prefaced as personal "bias." Some of his references concerned his understanding of the creative force behind human physiology. Other statements involved brief explanations of a philosophical approach to problems and advice to students on coping with academic stresses. In response to students' questions concerning academic research, publishing, tenure, or promotion, Bishop has suggested to the students that his religious beliefs are more important than academic production, and this perspective allows him to better cope with academic stresses. He never engaged in prayer, read passages from the Bible, handed out religious tracts, or arranged for guest speakers to lecture on a religious topic during instructional time.

Bishop is regarded as an excellent professor by his supervisor, Head of the

Health, Physical Education and Recreation Department, Carl Westerfield, who recommended him for early tenure. Defendants admit he is a capable teacher.

Bishop has an excellent record of publishing. Since 1984 he has authored or co-authored more published articles in journals related to his academic discipline than any other assistant professor in the area of health, physical education, and recreation at the University.

In April 1987 Bishop organized an after-class meeting for his students and other interested persons wherein he lectured on and discussed "Evidences of God in Human Physiology." Discussion covered various aspects of the human body including the complexity of its design and operation, concluding that man was created by God and was not the by-product of evolution. The class was attended by five Bishop students and one professor.

Defendants contend the timing of the class before final exams created the possibility of a coercive effect upon his students, a situation which the Establishment Clause of the Constitution is designed to prohibit. Attendance at the class, however, was voluntary and did not affect grades. Bishop used a blind grading system.

Some of Bishop's students in the 1986–87 classes complained about the comments and the after-class meeting to Westerfield. In late August or early September 1987 Westerfield met with the Dean of the College of Education, Rodney Roth, to discuss the complaints. After deciding Bishop's statements were inappropriate, they met with University counsel September 11, 1987. Thereafter, Westerfield drafted Bishop a memorandum instructing him to refrain from "1) the interjection of religious beliefs and/or preferences during instructional time periods and 2) the optional classes where a 'Christian Perspective' of an academic topic is delivered." The plaintiff has complied with the directive.

Although Bishop tried to have the order rescinded during the fall of 1987, his efforts were unsuccessful. The University, upon the advice of University counsel, advised him that as owner of the teaching facilities the University had the right to establish curriculum: it had not improperly interfered with academic freedom. It had a duty to act against Bishop to prevent an establishment of religion under the three-part test set out in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971), set forth below:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, . . .; finally, the statute must not foster "an excessive government entanglement with religion." (Citations omitted).

*Id.,* 403 U.S. at 612–13, 91 S.Ct. at 2111, 29 L.Ed.2d at 755 (interpretation of statutes providing state aid to church-related elementary and secondary schools).

University counsel opined that Bishop's comments lacked a secular purpose and had the effect of benefiting one religious point of view.

In May 1988 Bishop petitioned the President of the University to rescind the order. He was again advised there would be no rescission of the University prohibition and he should refrain from interjecting his religious preferences and/or beliefs not necessary to class discussion or class materials. The University viewed the holding of any optional class meeting to discuss religious implications of class material prior to the submission of final grades to be coercive and therefore, prohibited.

Numerous undisputed affidavits filed indicate University policy does not prohibit faculty members from engaging in non-religious classroom speech involving personal views on other subjects. Such discussions are the norm used to establish rapport between faculty and students. There is no University policy attempting to control the statements of faculty members as long as they do their job. Nor is there a University policy prohibiting faculty members from organizing after-class meetings if discussions are not from a religious perspective. The University has no policy proscribing professor involvement in extracurricular academic discussions with students.

Plaintiff filed suit September 21, 1988, against the individual members of the University Board of Trustees in their official capacities. The complaint, as amended, claims violations of his first and ninth amendment rights of speech and religion, applicable to the states through the fourteenth amendment. *Baird v. State Bar,* 401 U.S. 1, 5, 91 S.Ct. 702, 705, 27 L.Ed.2d 639 (1971). He further claims the restrictions to be vague and over broad.

In answer, the defendants claim it was their duty to restrict Bishop's speech which was violative of both the Establishment Clause of the United States Constitution and the Establishment Clause of the Alabama Constitution, article 1, section 3.

Cross motions for summary judgment were filed.

These facts necessitate interpretation of the Establishment Clause, specifically the following issues:

1. Does the University have the right to limit the topics which may be discussed in its classes?
2. Does a state university interest in preventing an establishment of religion authorize it to restrict its professors' freedom to make occasional classroom statements about personal religious views?
3. Does the same interest justify restricting a professor from holding after-class meetings with students on state university property to discuss a Christian perspective on academic topics?
4. Are the defendant's restrictions void for vagueness or because they are over broad?
5. Do the activities of Dr. Bishop violate the Establishment Clause of the first amendment?

■ While the law recognizes the right of universities to control the use of its facilities and the subject matter taught therein, it, nevertheless, has established that the first amendment rights of speech and association extend to the campuses of colleges and universities. Any restrictions on those rights require strict scrutiny. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (State university's refusal to grant student religious groups access to university facilities generally open to student groups, held unjustifiable, content based exclusion of religious speech). *Widmar* stands squarely for the proposition that government cannot redefine, under the guise of "academic judgment," an otherwise open forum to exclude religious matters.

University professors are entitled to freedom of speech in their jobs. *Keyishian v. Board of Regents of New York,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Pertinent portions follow:

Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." ... The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." ... In *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 1 L. ed [sic] 2d 1311, 1324, 77 S Ct 1203 [1211], we said:

"The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to in-

quire, to study and evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

.    .    .    .    .

"Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." ... When one must guess what conduct or utterances may lose him his position, one necessarily will "steer far wider of the lawful zone...." *Id.* 385 U.S. at 603, 87 S.Ct. at 683, 17 L.Ed.2d at 640–41. *See Healy v. James*, 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266 (1972) ("The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.'"); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737 (1969) (extended the rights of free speech under the first amendment into the classroom when it held neither teachers nor students "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."); *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), *reh'g denied*, 355 U.S. 852, 78 S.Ct. 7, 2 L.Ed.2d 61 (1957), (classroom advocacy of Marxism).

Since the University has taken the position that plaintiff has no first amendment right of expression at stake in its decision restricting inclusion of religious matters in his courses, any effort to exclude religious matters from Dr. Bishop's speech must be carefully scrutinized. The University "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270, 102 S.Ct. at 274, 70 L.Ed.2d at 448. It is not enough to say the plaintiff is free to believe as he wishes or free to act on his beliefs when he is not performing duties within the scope of his employment.

The interests of the state must be balanced against the rights of free speech of faculty members. *Trotman v. Board of Trustees of Lincoln University*, 635 F.2d 216 (3d Cir.1980), *cert. denied, Lincoln University v. Trotman*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981). Faculty members are at liberty to divulge personal views in the classroom as long as they are not disruptive of classroom activities. *Cooper v. Ross*, 472 F.Supp. 802, 810 (E.D.Ark. 1979). The *Cooper* court held an instructor's announcement that he was a communist did not "materially or substantially disrupt his classes." *Id.* It concluded that "in the context of a university classroom, Cooper had a constitutionally protected right simply to inform his students of his personal political and philosophical views." The court did not extend its holding to imply that a teacher has the right to proselytize students or to devote so much of class time to such matters that instruction of the subject matter is impaired. *Id.* at 811 n. 5. Neither does this court. Bishop's actions do not rise to that level. Expression of his personal views has not been disruptive and has not interfered with his teaching which is viewed as commendable.

■■■ The University has created a forum for students and their professors to engage in a free interchange of ideas. It may not exclude disfavored religious speech unless the exclusion is necessary to further a compelling governmental interest and narrowly tailored to further that interest. The plaintiff maintains the University's restriction, rather than being specifically tailored, is vague and over broad. He steers away from legitimate areas of study: theories of physiology as taught in medieval European universities—evolution —Creationism. Since their study would necessarily "interject religious beliefs" or "Christian Perspective," he is uncertain if their mention is banned by the University restriction.

The Court holds the University restriction which limits all expression of personal religious views as "unwarranted" is vague and over broad. It reaches statements not violative of the Establishment Clause and fails to provide adequate notice of the proscribed speech. The state's interest in disestablishment cannot overcome federal free speech rights. *Widmar*, 454 U.S. at 275–76, 102 S.Ct. at 277.

■■■ The University's only justification for exclusion is an effort to avoid an estab-

lishment of religion. This is not sufficiently compelling to support a content-based discrimination against plaintiff's extracurricular on-campus discussions with students or his in-class statements. Bishop's speech connected with his after-class meeting is part of an open exchange of ideas between students and faculty. As such it is protected by the first amendment. A meeting between Bishop and students to discuss subjects of mutual interest is consistent with the University's educational purpose and consistent with the practices of other professors who participate in such meetings. Furthermore, the court sees no difference in constitutional principle between Bishop's addressing a Christian student organization on campus, announcing to his students that he would be speaking, and inviting them to attend the meeting, as allowed by Dr. Westerfield, and Bishop's making the comments to his classes, either regular or optional, which are the subject of this suit.

In light of *Lemon*, supra, neither Bishop's comments nor his optional class runs afoul of the Establishment Clause. His conduct has a secular purpose. Education is secular when it encompasses exposure to "how" and "why" things are. His comments constitute a discussion of means and origins, a legitimate educational topic. Their primary effect does not advance or inhibit religion. They do not foster excessive government entanglement with religion. Accordingly, defendants' restrictions are unjustified. While the University has directed the court to four cases dealing with Establishment Clause issues wherein an employee of a governmental entity engaged in an activity without the approval of or against the instructions of his employer, none of the decisions was handed down by a court of last resort or by a United States Circuit Court of Appeals. Furthermore, plaintiff has not engaged in prohibited activities since notification by the University he was to cease.

While the defendants have prohibited the plaintiff from holding an optional after-class meeting, they have not prohibited other professors from organizing after-class activities on nonreligious subjects and have not prohibited a professor from conducting optional classes in which he discusses nonreligious perspectives on academic topics. Dr. Westerfield has stated that the prohibition does not even apply to other Christian groups. The Supreme Court has ruled that once a university has opened its facilities for use by student groups it cannot exclude other groups because of the content of their speech. *Widmar*, 454 U.S. at 273, 102 S.Ct. at 276. Any religious benefits stemming from an open forum are incidental. The open forum does not "confer any imprimatur of State approval on religious sects or practices." *Id.* at 274, 102 S.Ct. at 276. Nor does it "confer any imprimatur of State approval" on nonreligious groups who may, also, avail themselves of the open forum. This principle is applicable to the case at bar.

*Widmar* further affirmed lower court holdings that no excessive entanglement existed from allowing extracurricular meetings on campus. The neutral policy itself avoided excessive entanglement. Enforcement of exclusions on religious speech would constitute a greater risk of entanglement. *Widmar*, 454 U.S. at 272 n. 11, 102 S.Ct. at 275 n. 11, 70 L.Ed.2d at 449 n. 11.

In *Roemer v. Department of Public Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), by following the *Lemon* criteria, the court held that the Establishment Clause was not violated by a Maryland statute authorizing public funding of private religiously oriented colleges. In an atmosphere in which academic freedom is practiced, public funding of the college does not necessarily have the primary effect of advancing religion.

In light of *Widmar* and *Roemer*, Bishop's classroom comments and after-class meetings do not primarily advance religion. There is no evidence anyone believes his comments are anything other than his personal "bias" or that his religious views are in the least way sponsored by the state. Some comments are in response to student questions indirectly related to course work, such as research, tenure, promotion or publishing. They in no way present nearly so great an opportunity for influence or entanglement as do scheduled university

courses on religion or theology, which are acceptable to the University. *See Roemer, supra.* Nevertheless, while the University admits the teaching of these courses does not constitute an establishment of religion, it has issued a memorandum prohibiting professors teaching those courses from stating personal religious views.

Justice Stevens' concurring opinion in *Widmar* rejected the Establishment Clause concern expressed by the University.

[T]he University has not established a sufficient justification for its refusal to allow the Cornerstone group to engage in religious worship on the campus. The primary reason advanced for the discriminatory treatment is the University's fear of violating the Establishment Clause. But since the record discloses no danger that the University will appear to sponsor any particular religion, and since student participation in the Cornerstone meetings is entirely voluntary, the Court properly concludes that the University's fear is groundless. With that justification put to one side, the University has not met the burden that is imposed on it by Healy.

. . . . .

It seems apparent that the policy under attack would allow groups of young philosophers to meet to discuss their skepticism that a Supreme Being exists, or a group of political scientists to meet to debate the accuracy of the view that religion is the "opium of the people." If school facilities may be used to discuss anticlerical doctrine, it seems to me that comparable use by a group desiring to express a belief in God must also be permitted.

454 U.S. at 280–81, 102 S.Ct. at 279–80, 70 L.Ed.2d at 454–55.

It would be clearly violative of the first amendment to allow presentation of one side of a debatable public question an advantage while suppressing the other. The University's directive is inconsistent. While it precludes discussion of academic subjects from a "Christian Perspective," it does not ban Jewish, Moslem, Hindu, Taoist, or other religious perspectives of course work.

The real issue in an Establishment Clause inquiry is the extent of state involvement. The government must be careful not to establish or condone any relationship with its citizens in which the government, by statute, or policy or practice, exerts influence over a person's religious beliefs. The court doubts that the plaintiff's minimal comments exert influence on the religious beliefs of college or graduate students. The court finds no merit to defendants' arguments that plaintiff's activities will lead to excessive government entanglement with religion. It further finds the University's comment that it would be forced to monitor plaintiff's speech and that of other faculty members "to make judgments about which statements are permissible and which statements are not permissible" a reflection of a seriously erroneous misunderstanding of the first amendment. Such monitoring would be an especially offensive violation of that amendment.

For the reasons set forth in this opinion the court holds the plaintiff has not violated the Establishment Clause of the Constitution. In so holding, it enjoins the University from restricting his first amendment rights. The University has no interest sufficient to justify restricting a professor's freedom to make occasional classroom comments about personal religious beliefs or to restrict him from holding after-class meetings with students on state university property to discuss a Christian perspective on academic topics. The plaintiff is entitled to summary judgment.

An order consistent with this opinion is being entered contemporaneously herewith. That order will contain a qualification of the allowance of the special class that the class be assured that a blind grading system is used.

### FINAL ORDER GRANTING SUMMARY JUDGMENT

This cause comes before the court on cross motions for summary judgment. Having considered the motions, the pleadings, the submissions of counsel, and the applicable law, the court is of the opinion that judgment is due the plaintiff as a

matter of law, there being no genuine issue of material fact and there being no just reason for delay in entering a final judgment. Accordingly, in conformity with the memorandum opinion being entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the defendants' motion for summary judgment be and it hereby is DENIED. It is

FURTHER ORDERED, ADJUDGED and DECREED that the plaintiff's motion for summary judgment be and it hereby is GRANTED, and it is

FURTHER ORDERED, ADJUDGED and DECREED that defendants be and they hereby are ENJOINED from taking any action restricting plaintiff's first amendment rights of academic speech and religion. It is

FURTHER ORDERED, ADJUDGED and DECREED that the defendants be and they hereby are ENJOINED from restricting the plaintiff's classroom speech as long as it does not exceed the parameters of speech outlined in this opinion. It is

FURTHER ORDERED, ADJUDGED and DECREED that the plaintiff be allowed to hold his special class in a University building only if permission is sought and only if he assures the class that a blind grading system is used. It is

FURTHER ORDERED, ADJUDGED and DECREED that the University may not unreasonably withhold permission for the plaintiff to hold his special class in a University building. It is

FURTHER ORDERED, ADJUDGED and DECREED that if the plaintiff decides to hold his special class at some place other than a University building he must assure the class that a blind grading system is used. It is

FURTHER ORDERED, ADJUDGED and DECREED that FINAL JUDGMENT be and it hereby is ENTERED in favor of plaintiff.

DONE and ORDERED.