926 F.2d 1066
 59 USLW 2583, 65 Ed. Law Rep. 1109
 Phillip A. BISHOP, Plaintiff-Appellee,
v.
Aaron M. ARONOV, Winton M. Blount, O.H. Delchamps, Jr.,
Sandrall Hullett, Guy Hunt, William Henry Mitchell, John T.
Oliver, Jr., Thomas E. Rast, Yetta G. Samford, Jr., Martha
H. Simms, Wayne Teague, Cleophus Thomas, Jr., George S.
Shirley, Cordell Wynn, all in their official capacities as
members of the Board of Trustees of the University of
Alabama, Defendants-Appellants.
 No. 90-7230.
 United States Court of Appeals,
Eleventh Circuit.
 March 15, 1991.
 
 Kenneth L. Goodwin, Paul E. Skidmore and Stanley J. Murphy, University of Alabama System, Office of Counsel, Tuscaloosa, Ala., for defendants-appellants.
 Albert L. Jordan, Wallace, Brooke & Byers, Birmingham, Ala., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before COX and BIRCH, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge:
 
 
 1
 The University of Alabama through its Board of Trustees (the "University") appeals the district court's summary judgment and other orders in favor of Assistant Professor Phillip A. Bishop ("Dr. Bishop") enjoining the University from curtailing his speech and religion rights in certain respects.[1] We conclude that the action taken by the University did not transgress constitutional guarantees and proscriptions, and we now reverse.
 
 I. BACKGROUND
 
 2
 Our review of the record reveals that a completely independent statement of the facts would not be useful. We do not disagree with the district court as to any facts, though our views diverge as to the controlling legal principles and the conclusions to be drawn from them. These questions of law we take up presently by a de novo review of the interplay between the facts and law. See Jones v. Heyman, 888 F.2d 1328, 1330-31 (11th Cir.1989) (per curiam) (citations omitted). First, we largely adopt the district court's statement of the facts, quoting freely therefrom and supplementing it as necessary.
 
 
 3
 Phillip A. Bishop has been employed as assistant professor in the Area of Health, Physical Education, and Recreation [HPER], in the College of Education at the University of Alabama and Director of its Human Performance Laboratory since 1984. He teaches exercise physiology, his specialty, to graduate and undergraduate students and supervises research problems and theses.
 
 
 4
 During the fall of 1984 through the spring of 1987 Dr. Bishop occasionally referred to his religious beliefs during instructional time, remarks which he prefaced as personal "bias." Some of his references concerned his understanding of the creative force behind human physiology. Other statements involved brief explanations of a philosophical approach to problems and advice to students on coping with academic stresses. In response to students' questions concerning academic research, publishing, tenure, or promotion, Bishop has suggested to the students that his religious beliefs are more important than academic production, and this perspective allows him to better cope with academic stresses. He never engaged in prayer, read passages from the Bible, handed out religious tracts, or arranged for guest speakers to lecture on a religious topic during instructional time.
 
 
 5
 Bishop, 732 F.Supp. at 1563.
 
 
 6
 There are no transcriptions of Dr. Bishop's actual in-class comments. However, attached to his summary judgment motion is an affidavit wherein he affords us an approximation of his remarks.
 
 
 7
 The statement [I made to the class] was generally something like the following: ...
 
 
 8
 After giving it considerable thought, I have decided for myself when I die, I would like to leave behind something more important and valuable than a stack of technical papers. I think that people are important and eternal, paper is neither. I want to invest my time mainly in people. I personally believe God came to earth in the form of Jesus Christ and he has something to tell us about life which is crucial to success and happiness. Now this is simply my personal belief, understand, and I try to model my life after Christ, who was concerned with people, and I feel that is the wisest thing I can do. You need to recognize as my students that this is my bias and it colors everything I say and do. If that is not your bias, that is fine. You need, however to, filter everything I say with that (Christian bias) filter. If you observe something in my life that is inconsistent with Christianity, please let me know, because, I believe that it is much more important than a pile of papers.
 
 
 9
 Affidavit of Phillip A. Bishop at 2, attachment to Plaintiff's Motion for Summary Judgment, Record on Appeal, Vol. 2, Doc. 40 (Hereinafter "Bishop Affidavit").
 
 
 10
 In April 1987 Bishop organized an after-class meeting for his students and other interested persons wherein he lectured on and discussed "Evidences of God in Human Physiology." Discussion covered various aspects of the human body including the complexity of its design and operation, concluding that man was created by God and was not the by-product of evolution. The class was attended by five Bishop students and one professor.
 
 
 11
 [The University] contend[s] that the timing of the class before final exams created the possibility of a coercive effect upon his students, a situation which the Establishment Clause of the Constitution is designed to prohibit. Attendance at the class, however, was voluntary and did not affect grades. Bishop used a blind grading system.
 
 
 12
 Some of Bishop's students in the 1986-87 classes complained about [Bishop's in-class] comments and the after-class meeting to [Carl] Westerfield [Bishop's supervisor and Head of HPER]. In late August or early September 1987 Westerfield met with the Dean of the College of Education, Rodney Roth, to discuss the complaints. After deciding Bishop's statements were inappropriate, they met with University counsel September 11, 1987.
 
 
 13
 Bishop, 732 F.Supp. at 1564.
 
 
 14
 Westerfield prepared a memorandum to "Dr. Phil Bishop" concerning his conduct. The memo regards "Religious Activities in a Public Institution" and reads as follows:
 
 
 15
 Foremost, I want to reaffirm our commitment to your right of academic freedom and freedom of religious belief. This communication should not be construed as an attempt to interfere with or suppress your freedoms. From discourse with you and others, I feel that certain actions on your behalf are unwarranted at a public institution such as The University of Alabama and should cease. Among those actions that should be discontinued are: 1) the interjection of religious beliefs and/or preferences during instructional time periods and 2) the optional classes where a "Christian Perspective" of an academic topic is delivered. I must also remind you that religious beliefs and/or the strength of a belief can not be utilized in the decisions concerning the recruitment, admission or retention of graduate students.
 
 
 16
 Record Excerpt at 15.[2] (Hereinafter the "memo.") The tenor of this document demonstrates the first amendment tight rope upon which the University found itself perched. Without unnecessarily restricting the academic freedom of a faculty member, the University endeavored to avoid both Establishment Clause violations and undue pressure upon students. The University's counsel believed that under Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (excessive entanglement between government and religion), Dr. Bishop's activities did amount to such violations, thus the University refused the professor's later requests to rescind the Westerfield order. In the interim, Dr. Bishop apparently complied with the University's wishes.
 
 
 17
 In May 1988 Bishop [through letter of his counsel] petitioned the President of the University to rescind the order. [Bishop] was again advised there would be no rescission of the University prohibition and he should refrain from interjecting his religious preferences and/or beliefs not necessary to class discussion or class materials. The University viewed the holding of any optional class meeting to discuss religious implications of class material prior to the submission of final grades to be coercive and [,] therefore, prohibited.
 
 
 18
 Numerous undisputed affidavits filed indicate University policy does not prohibit faculty members from engaging in non-religious classroom speech involving personal views on other subjects. Such discussions are the norm used to establish rapport between faculty and students. There is no University policy attempting to control the statements of faculty members as long as they do their job. Nor is there a University policy prohibiting faculty members from organizing after-class meetings if discussions are not from a religious perspective. The University has no policy proscribing professor involvement in extracurricular academic discussions with students.
 
 
 19
 Bishop, 732 F.Supp. at 1564.
 
 
 20
 In light of the continued restriction of his speech in a manner apparently contradictory to the University's erstwhile declarations of academic freedom, Dr. Bishop filed suit in federal district court against the Board of Trustees of the University in their official capacities under 42 U.S.C. Sec. 1983, seeking only declaratory and injunctive relief for violations of his free speech rights by imposition of Westerfield's memo. The initial complaint also claimed that the memo was voidable for vague and overbroad restriction of his free speech rights. By amendment to his complaint, Dr. Bishop also pleaded violations of his free exercise rights and his rights under the ninth amendment.[3] In significant parts, the University's answer and amended answer generally denied any First and Ninth Amendment violations and raised the Establishment Clauses of the United States and Alabama Constitutions as affirmative defenses.
 
 
 21
 After cross-motions for summary judgment, the district court relied on Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), and determined that "[t]he University has created a forum for students and their professors to engage in a free interchange of ideas[,]" Bishop, 732 F.Supp. at 1566, and that "Bishop's speech connected with his after-class meeting is part of an open exchange of ideas between students and faculty[,]" id. at 1567. The court concluded that the Westerfield memo was overbroad and vague because "[i]t reaches statements not violative of the Establishment Clause and fails to provide adequate notice of the proscribed speech." Id. at 1566. As for the University's claim of an Establishment Clause violation by Dr. Bishop's actions, the district court found that his conduct had a primarily secular purpose which did not amount to an establishment of religion under Lemon. Id. at 1567.
 
 
 22
 The district court summed up its thinking as follows:
 
 
 23
 The University has no interest sufficient to justify restricting a professor's freedom to make occasional classroom comments about personal religious beliefs or to restrict him from holding after-class meetings with students on state university property to discuss a Christian perspective on academic topics. [Bishop] is entitled to summary judgment.
 
 
 24
 Id. at 1568. The final order entered by the district court granted summary judgment to Dr. Bishop and otherwise ordered that 1) the University be "enjoined from taking any action restricting [Dr. Bishop]'s first amendment rights of academic speech and religion[;]" 2) the University be "enjoined from restricting [Dr. Bishop]'s classroom speech as long as it does not exceed the parameters of speech outlined in this opinion[;]" 3) "[Dr. Bishop] be allowed to hold his special class in a University building only if permission is sought and only if he assures the class that a blind grading system is used[;]" 4) "the University may not unreasonably withhold permission for the plaintiff to hold his special class in a University building[;]" and 5) "if [Dr. Bishop] decides to hold his special class at some place other than a University building he must assure the class that a blind grading system is used." Id. at 1569. The University appeals this final order of summary judgment.
 
 II. DISCUSSION
 A. Open Forum
 
 25
 First amendment doctrines are manifold, and their diverse facts and analyses may reveal but one consistent truth with respect to the amendment--each case is decided on its own merits. Nevertheless, a correct legal analysis must predicate proper explication of the constitutionally pivotal facts. This is not a forum case. We disagree with the district court's conclusion that a university classroom is an open forum during instructional time.
 
 
 26
 In deciding that a school newspaper published by a journalism class was not a public forum, the Supreme Court restated the examination to be made:
 
 
 27
 [S]chool facilities may be deemed to be public forums only if school authorities have "by policy or by practice" opened those facilities "for indiscriminate use by the general public," Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 47 [103 S.Ct. 948, 956, 74 L.Ed.2d 794] (1983), or by some segment of the public, such as student organizations. Id., at 46, n. 7 [103 S.Ct. at 955 n. 7] (citing Widmar v. Vincent ). If the facilities have instead been reserved for other intended purposes ... then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community.
 
 
 28
 Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988) (emphasis added). While the University may make its classrooms available for other purposes, we have no doubt that during instructional periods the University's classrooms are "reserved for other intended purposes," viz., the teaching of a particular university course for credit. Thus, we first hold that Dr. Bishop's classroom is not an open forum. The next issue to determine is whether the University by its memo has reasonably restricted Dr. Bishop's speech or exercise rights therein.
 
 B. Free Speech[4]
 1. Overbreadth
 
 29
 First we take Dr. Bishop's facial charges of overbreadth and vagueness, for if correct, no closer, substantive inquiry would be necessary. However, we find the memo's restrictions to be neither overbroad nor vague. We recognize that the memo is less than ideal. While counsel for Dr. Bishop has raised several nice questions about the reach of the memo, they are more imagined than genuine. The restrictions reach only course-related, in-class remarks of Dr. Bishop and his "optional" classes. We take this view of the memo under our "obligation to construe the challenged [restrictions] narrowly[.]" See American Booksellers v. Webb, 919 F.2d 1493, 1500 (11th Cir.1990). "It has long been a tenet of First Amendment law that in determining a facial challenge to a statute [here the memo], if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." Id. (quoting Virginia v. American Booksellers Association, 484 U.S. 383, 397, 108 S.Ct. 636, 644-45, 98 L.Ed.2d 782 (1988) (citations omitted) (subsequent history omitted)) (footnote omitted).
 
 
 30
 Because the University's memo responded to particular conduct by Dr. Bishop, we believe it can be said to be " 'readily susceptible' to a narrowing construction." We conclude that the University's restrictions as expressed in its memo are sufficiently narrow and clear to put Dr. Bishop on notice of what he cannot do and do not reach otherwise protected speech. We are confident that, as a professional, Dr. Bishop knows that the University asks only that he separate his personal and professional beliefs and that he not impart the former to his students during "instructional time" or under the guise of the courses he teaches in so-called optional classes.
 
 
 31
 To suggest that the memo is vague (and a vagary) Dr. Bishop has tried to make much of the fact that the University has no policy for limiting the speech of its professors only to their subject areas. One would not expect to find such a policy, and, to the contrary, as one would expect, there are various indications (as in the memo itself) that the University generally endorses academic freedom for its faculty. See Bishop, 732 F.Supp. at 1564. Dr. Bishop has filed numerous affidavits by other instructors at the University describing their extracurricular speech in the classroom as efforts to reach out to students. Id. These attempts at professor-student affinity are laudable. But plainly some topics understandably produce more apprehension than comfort in students. Just as women students would find no comfort in an openly sexist instructor, an Islamic or Jewish student will not likely savor the Christian bias that Dr. Bishop professes, much less seek camaraderie by trying to discovery "something in [Dr. Bishop's] life that is inconsistent with Christianity." Bishop Affidavit at 2. The opposite effect was apparently achieved. There is no suggestion that any other professor has produced student complaints or struck constitutional chords. Because the University may heretofore not have restricted the classroom speech of any other professor does not make out a case of overbreadth, vagueness, or infringement as to Dr. Bishop.
 
 
 32
 2. Much Extant (but ultimately inconclusive) Case Law
 
 
 33
 Though the religion clauses are implicated because of the indisputably religious character of Dr. Bishop's remarks, the primary analysis that must be made here ascends from the cases that discuss the free speech rights of public teachers.[5] While neither teachers nor students "shed their constitutional rights to [free speech] at the schoolhouse gate[,]" Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).
 
 
 34
 the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
 
 
 35
 Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). Teachers cannot suffer reprisal for speaking on a matter of public concern by speech which they would be entitled to make as private persons unless that speech "impeded [their] proper performance of ... daily duties in the classroom or ... interfered with the regular operation of the schools generally." Id. at 572-73, 88 S.Ct. at 1737, (footnote omitted). Though Pickering addresses only out-of-school speech by teachers, we take it as our starting point because of the balancing it suggests. In and out of school, some balance must be reached.[6]
 
 
 36
 The following term, the Supreme Court decided Tinker. The Court encountered the free expression rights (exercised by wearing black armbands) claimed by students. The case describes a standard by which to gauge restriction of in-class expression:
 
 
 37
 In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. Burnside v. Byars, [363 F.2d 744], 749 [ (5th Cir.1966) ].
 
 
 38
 In the present case, the District Court made no such finding, and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students.
 
 
 39
 Tinker, 393 U.S. at 509, 89 S.Ct. at 738. While Tinker deals with in-class conduct, and reiterates the belief that such conduct cannot be entirely unfettered, the case involves students, not teachers. We do not believe that the "material and substantial interference" test applied to student expression can control this case.
 
 
 40
 The Tenth Circuit has recently decided a more factually similar case that instructively relies on Tinker to evaluate a school's decision to require a fifth-grade teacher to remove certain texts from his classroom library and to refrain from silently reading the Bible during an in-class reading time. Roberts v. Madigan, 921 F.2d 1047, 1056-57 (10th Cir.1990). However, the real foundation for our Sister Circuit's conclusion seems to be Kuhlmeier. Thereunder, the Tenth Circuit found support for restriction of a teacher's activity where "the [teacher's] conduct endorses a particular religion and is an activity 'that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school[.]' " Id. at 1057 (quoting Kuhlmeier, 484 U.S. at 271, 108 S.Ct. at 569).
 
 
 41
 The key difference between Roberts and Tinker lies in the actor. While a student's expression can be more readily identified as a thing independent of the school, a teacher's speech can be taken as directly and deliberately representative of the school. Hence, where the in-class speech of a teacher is concerned, the school has an interest not only in preventing interference with the day-to-day operation of its classrooms as in Tinker, but also in scrutinizing expressions that "the public might reasonably perceive to bear [its] imprimatur[.]" Id.
 
 
 42
 This Court has also indicated how Tinker can be distinguished from Kuhlmeier. In Alabama Student Party v. Student Government Association, 867 F.2d 1344 (11th Cir.1989), then-Chief Judge Roney wrote:
 
 
 43
 The [Supreme] Court recognized there is a difference between speech a school must tolerate and speech a school must affirmatively promote. In [Kuhlmeier ], the school could determine what was appropriate in a school-sponsored student newspaper when that newspaper was legitimately part of the learning experience, the curriculum, of the school.
 
 
 44
 ....
 
 
 45
 The University should be entitled to place reasonable restrictions on this learning experience.
 
 
 46
 Id. at 1347 (emphasis in original).
 
 
 47
 The question becomes to what degree a school may control classroom instruction before touching the First Amendment rights of a teacher. "Courts agree ... that the school's administration may at least establish the parameters of focus and general subject matter of curriculum." Mahoney v. Hankin, 593 F.Supp. 1171, 1174 (S.D.N.Y.1984) (citing Clark v. Holmes, 474 F.2d 928 (7th Cir.1972), cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973)). Mahoney goes on to discuss two circuit court decisions that weigh the interests of the school against the "teacher's pedagogical choices." Id. at 1175 (citing Mailloux v. Kiley, 448 F.2d 1242 (1st Cir.1971) (per curiam) and East Hartford Educ. Association v. Board of Ed. of Town of East Hartford, 562 F.2d 838, 843-44, vacated on rehearing en banc, 562 F.2d 856 (2d Cir.1977)) (footnote omitted).
 
 
 48
 The Second Circuit case dealt with a faculty dress code that was upheld on summary judgment by the district court and ultimately upheld by the Second Circuit sitting en banc. Judge Meskill wrote the opinion for the en banc majority. His dissent from the panel opinion included the following salient remark: "the First Amendment leaves undisturbed the power of local officials to prescribe the curriculum and teaching techniques of the schools in their care." East Hartford, 562 F.2d at 851 (Meskill, J., dissenting) (footnote omitted). The First Circuit case dealt with the dismissal of a public school teacher for an alleged violation of a Code of Ethics. Though a brief per curiam, the opinion remarks astutely that:
 
 
 49
 free speech does not grant teachers a license to say or write in class whatever they may feel like, and ... the propriety of regulations or sanctions must depend on such circumstances as the age and sophistication of the students, the closeness of the relation between the specific technique used and some concededly valid educational objective, and the context and manner of presentation.
 
 
 50
 Mailloux, 448 F.2d at 1243. Yet, neither of these cases precisely matches the facts of our case. Thus, as the First Circuit further noted, "we see no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." Id.
 
 3. Our Suggested And Applied Balance
 
 51
 Because there are no cases satisfactorily on point with this one to adopt as controlling, we must frame our own analysis to determine the sufficiency of the University's interests in restricting Dr. Bishop's expression in the classroom. The balance we suggest, though somewhat amorphous, takes as its polestar Kuhlmeier 's concern for the "basic educational mission" of the school which gives it authority by the use of "reasonable restrictions" over in-class speech that it could not censor outside the classroom. Kuhlmeier, 484 U.S. at 266-67, 108 S.Ct. at 567-68 (citations omitted).
 
 
 52
 [W]e conclude that the standard articulated in Tinker for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student [or professor] expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student [or professor] speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.
 
 
 53
 This standard is consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.
 
 
 54
 Id. at 272-73, 108 S.Ct. at 570-71 (footnotes and citations omitted). Kuhlmeier, like most cases we have encountered, dealt with students at the secondary level. Yet, insofar as it covers the extent to which an institution may limit in-school expressions which suggest the school's approval, we adopt the Court's reasoning as suitable to our ends, even at the university level.
 
 
 55
 In an effort to calibrate the Constitution in this case, we contemplate much. First and foremost, we consider the context: the university classroom during specific in-class time and the visage of the classroom as part of a university course in an after-class meeting. This context also leads us to consider the coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid. The University's interest is most obvious when student complaints suggest apparent coercion--even when not intended by the professor.
 
 
 56
 Second, it follows, we consider the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than the those of other persons. As a place of schooling with a teaching mission, we consider the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time. Tangential to the authority over its curriculum, there lies some authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university.
 
 
 57
 Last and somewhat countervailing, we consider the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment. There are abundant cases which acclaim academic freedom. Perhaps the most applicable is Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), in which Justice Brennan wrote:
 
 
 58
 Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection."
 
 
 59
 Id. at 603, 87 S.Ct. at 683-84 (citations omitted). Keyishian dealt with that brand of regulation most offensive to a free society: loyalty oaths. The Court's pronouncements about academic freedom in that context, however, cannot be extrapolated to deny schools command of their own courses. As this court has said in a case deciding the power of the University to regulate student government elections:
 
 
 60
 The University judgment on matters such as this should be given great deference by federal courts. This Court should honor the traditional "reluctance to trench on the prerogatives of state and local educational institutions." Regents of University of Michigan v. Ewing, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985). The reason for this is that "[a]cademic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." Id. at 226 n. 12, 106 S.Ct. at 514 n. 12. (citations omitted). In the present case, and in other school cases raising similar First Amendment challenges, these principles translate into a degree of deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission.
 
 
 61
 Alabama Student Party, 867 F.2d at 1347; see also Virgil v. School Bd. of Columbia County, Fla., 862 F.2d 1517, 1520 (11th Cir.1989) ("[i]n matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity.") (citing Kuhlmeier ).
 
 
 62
 Though we are mindful of the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right. And, in any event, we cannot supplant our discretion for that of the University. Federal judges should not be ersatz deans or educators. In this regard, we trust that the University will serve its own interests as well as those of its professors in pursuit of academic freedom. University officials are undoubtedly aware that quality faculty members will be hard to attract and retain if they are to be shackled in much of what they do.
 
 
 63
 With these considerations in mind, we turn to the case at hand. The University, by its memo from Dr. Westerfield, responded to complaints about Dr. Bishop's religious references by some of his students and, therefore, restricted the instructional activities of Dr. Bishop as to religious intimations. The restrictions placed on Dr. Bishop by the University were that he refrain from "1) the interjection of religious beliefs and/or preferences during instructional time periods and 2) the optional classes where a 'Christian Perspective' of an academic topic is delivered." Record Excerpt at 15.
 
 
 64
 We read the memo's restrictions narrowly because they implicate First Amendment freedoms. They apply only to the classroom speech of Dr. Bishop--wherever he purports to conduct a class for the University. At those times and places, he may not interject his religious views into the course material. Of course, if a student asks about his religious views, he may fairly answer the question. Under the memo, the University seeks only to prevent Dr. Bishop from making assertions about his religious beliefs vis-a-vis the subject matter of his courses.
 
 
 65
 Dr. Bishop has expressed certain personal (perhaps even professional) opinions about his work that happen to have a religious source.[7] The University has concluded that those opinions should not be represented in the courses he teaches at the University. The University has not suggested that Dr. Bishop cannot hold his particular views; express them, on his own time, far and wide and to whomever will listen; or write and publish, no doubt authoritatively, on them; nor could it so prohibit him. The University has simply said that he may not discuss his religious beliefs or opinions under the guise of University courses.
 
 
 66
 The University's chief concern is that its courses be taught without personal religious bias unnecessarily infecting the teacher or the students. Dr. Bishop's interest in academic freedom and free speech do not displace the University's interest inside the classroom. Contrary to the district court, Bishop, 732 F.Supp. at 1568, we find that the University's interests in the classroom conduct of its professors are sufficient, in the balance we have suggested, to warrant the reasonable restrictions it has imposed on Dr. Bishop. Under the analysis by which we have examined the University's action, we do not discover an infringement of Dr. Bishop's free speech rights.
 
 
 67
 As for the after-class meetings, the University has concluded that meetings on the evidence of God in human physiology or from a "Christian perspective" cannot be conducted by Dr. Bishop in a manner that connects them to the courses he teaches. The University has not suggested that Dr. Bishop cannot organize such meetings, make notice of them on campus, or request University space to conduct them; nor could it so prohibit him. The University has simply said he may not hold such meetings as classes related to the courses he teaches. The phrasing "optional class" or "optional meeting" and the scheduling before finals gave the impression of official sanction, which might have unduly pressured students into attending and, at least for purposes of examination, into adopting the beliefs expressed by Dr. Bishop. The University may seek to avoid these consequences, even where unintended. Conversely, when Dr. Bishop makes it plain to his students that such meetings are not mandatory, not considered part of the course work, and not related to grading, the University cannot prevent him from conducting such meetings, nor has it.
 
 
 68
 Fairly read, the phrasing "optional classes" in the University's memo plainly requires Dr. Bishop to completely disassociate such meetings from his courses. This simple restriction, put into the applicable balance we have outlined, is reasonable and supported by sufficient University interests as we have indicated. Again, we do not discover an infringement of Dr. Bishop's free speech rights.
 
 
 69
 In short, Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in such a dispute. Though Dr. Bishop's sincerity cannot be doubted, his educational judgment can be questioned and redirected by the University when he is acting under its auspices as a course instructor, but not when he acts as an independent educator or researcher. The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments. By its memo to Dr. Bishop, the University seeks to prevent him from presenting his religious viewpoint during instructional time, even to the extent that it represents his professional opinion about his subject matter. We have simply concluded that the University as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings.
 
 C. The Religion Clauses[8]
 1. Free Exercise
 
 70
 Though Dr. Bishop's amended complaint raises his exercise rights, we find his arguments do not merit our close attention. As we have noted, the religious facets of this case cloud its true countenance. We are not persuaded that, even in the remotest sense, Dr. Bishop's rights of free exercise or worship as those concepts are comprehended in constitutional parlance are implicated. He has made no true suggestion, much less demonstration, that any proscribed conduct of his impedes the practice of his religion. In fact, he has been careful to avoid ascribing his beliefs to a particular religion and to avoid describing his conduct as so connected, other than to say his values are Christian in a broad and unspecific sense. Furthermore, the University's restrictions of him are not directed at his efforts to practice religion, per se, but rather are directed at his practice of teaching. If either Dr. Bishop's or the University's conduct truly went to the exercise of religion by Dr. Bishop, no doubt the Establishment Clause would resolve the case. As it is before us, we see no free exercise question.
 
 2. Establishment of Religion
 
 71
 The University issued its memorandum purportedly to avoid an establishment of religion by Dr. Bishop's conduct which connected the University to a particular religious viewpoint. Such a connection can give the impression that the University sponsors that viewpoint. Because of the potential establishment conflict, even the appearance of proselytizing by a professor should be a real concern to the University. If a clear establishment violation existed, this case would be over, without resort to the evaluation we have already made. See Roberts, 921 F.2d at 1053-56. While we do not reach the question, we note that Dr. Bishop's optional class was particularly suspect. The creation/design aspect of his lecture could have lent itself to an analysis as found in Edwards v. Aquillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). In any event, we do not reach the establishment questions raised by Dr. Bishop's conduct. The University can restrict speech that falls short of an establishment violation, and we have already disposed of the University's restrictions of Dr. Bishop under the free speech clause.
 
 
 72
 On the other hand, Dr. Bishop has suggested that the University's restrictions are themselves an establishment of religion because they exclude only Christian viewpoints. We disagree. Applying Lemon, 1) the University's restrictions have only a secular purpose--by limiting Dr. Bishop's religious remarks the University does not endeavor to promote other religions or religious viewpoints; 2) the restrictions neither advance nor inhibit religion--to the contrary, the University has simply attempted to maintain a neutral, secular classroom by its restrictions on Dr. Bishop's expressions; and finally, 3) the University's restrictions do not promote excessive entanglement with religion--again, the University seeks only to extricate itself from any religious influence or instruction in its secular courses. See Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111.
 
 
 73
 We also note that the memo excludes Christian viewpoints alone because it is addressed to Dr. Bishop, who expressed them alone. No other complaints presented to the University as to other religious viewpoints are before the court. Should another professor express religious beliefs in the classroom, the University would likely produce a similar memo. Heretofore, the University has apparently not found it necessary to remind its faculty that the expression of a religious position in a secular subject, no matter how carefully presented, creates the appearance of endorsement of that position by the University and engenders anxiety in students who may feel compelled to feign a similar belief and, worse still, deny their own beliefs. By its effort to avoid endorsement of Dr. Bishop's religious ideas in its classrooms, the University's memo does not create an establishment of religion.
 
 III. CONCLUSION
 
 74
 We hold that the University's restrictions with respect to classroom conduct issued under its authority to control curriculum do not infringe the free speech or free exercise rights of Dr. Bishop as discussed above. The memo proscribes particular conduct of Dr. Bishop so that he can know what the University does not want him to do. However, balanced against the interests of academic freedom, the memo cannot proscribe Dr. Bishop's conduct to an extent any greater than we have indicated by our opinion.
 
 
 75
 We also hold that the memo's restriction with respect to the optional after-class meeting did not infringe on Dr. Bishop's free speech or free exercise rights. Under its authority to control curricular conduct, the University may restrict a professor from conducting an "extra" or "optional" class or meeting under the patronage of a university course. In particular, scheduling the class directly before finals and describing it as an "optional class" can be prohibited to avoid the apparent sponsorship of the University. However, like the district court, we hold that the University cannot prevent Dr. Bishop from organizing such a meeting for interested persons, either on or off University grounds. Should Dr. Bishop again conduct such meetings and invite his students, the University may direct that Dr. Bishop make it clear to students that the meeting is neither required for course credit nor sanctioned by the University and that Dr. Bishop employ blind-grading and so assure students.
 
 
 76
 We do not reach the question of establishment of religion by Dr. Bishop.[9] While the University acted on its conclusions in that regard, we hold that its memo was reasonable and within its powers to control the content of curriculum in the classroom, regardless of the Establishment Clause. The University necessarily has dominion over what is taught by its professors and may so manage them. We finally hold that the University's memo does not create an establishment of religion; rather, it seeks to avoid any entanglement with religion and furthers the unstated but accepted principle of separation of church and state.
 
 
 77
 We direct the district court to enter summary judgment for the University and against Dr. Bishop consistent with this opinion. As indicated, the judgment and order of the district court are
 
 
 78
 REVERSED.
 
 
 
 *
 The Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The opinion of the district court is published as Bishop v. Aronov, 732 F.Supp. 1562 (N.D.Ala.1990)
 
 
 [2]
 This last sentence refers to a suggestion by Bishop to the faculty that the department make an effort to recruit graduate students who had strong Christian backgrounds and beliefs. The right of Bishop to make such suggestions or of the University to make such decisions is not before the court, though surely the former can, while the latter cannot
 
 
 [3]
 All of Dr. Bishop's First Amendment claims against the University are, of course, made by incorporation through the Fourteenth Amendment
 
 
 [4]
 "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I
 
 
 [5]
 A thoughtful examination of the speech rights of teachers is made in Note, Public School Teachers and the First Amendment: Protecting the Right to Teach, 65 N.Y.U.L.Rev. 693 (1990). The article suggests a balancing approach somewhat like the one we will endeavor to apply. The article, however, weighs teacher autonomy more heavily than we have concluded is proper under Kuhlmeier
 
 
 [6]
 In a case decided soon after Pickering, the former Fifth Circuit noted the necessity of framing a balance between school and teacher interests. Pred v. Board of Public Instruction of Dade County, Fla., 415 F.2d 851, 855-59 (5th Cir.1969). Though the case only reversed for improvident dismissal of the teacher's complaint by the district court and did not reach any facts of record or suggest a particular analysis, the opinion by then-Chief Judge John R. Brown provides a helpful discussion of the relevant First Amendment law to that date
 
 
 [7]
 In this respect, Dr. Bishop's efforts to identify a personal bias, present it to his students, and hold it up for criticism are admirable. We are not convinced, however, that Dr. Bishop has fully comprehended the separation of his personal views from his professorial duties that the University demands. He has said that his Christian perspective touches everything he says and does. In this regard, while we respect Dr. Bishop's professional views as informed by his religious beliefs, we point out that the two have to be conceptually separated for fair analysis. That is, simply renaming religious views as professional, no matter how well-founded (and we are in no position to gauge that) does not deny the authority of his employer to request that he sequester the personal from the professional nor dismiss the specter of an establishment violation
 
 
 [8]
 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I
 
 
 [9]
 We also do not reach the Alabama Constitution or the ninth amendment of the United States Constitution. Dr. Bishop only pleaded the ninth amendment in the barest language. His appellate arguments do not even attempt to skeletally state a ninth amendment case. Whatever rights the ninth amendment does ensconce, we are confident that Dr. Bishop's case arises and concludes under the first amendment