PRYOR, Circuit Judge,
concurring:
I join the panel opinion in full, but write separately to explain a few additional points about the context of this appeal.
The record before us contains some isolated evidence that officials of Augusta State University initially intended to engage in viewpoint discrimination against Jennifer Keeton. See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 828, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). In the initial remediation plan document, Augusta State identified three viewpoints that the university disfavors: (1) Keeton “voiced disagreement in several class discussions and in written assignments with the gay and lesbian ‘lifestyle’ ”; (2) Keeton “stated in one paper that she believes GLBTQ lifestyles to be identity confusion”; and (3) Keeton “relayed her interest in conversion therapy for GLBTQ populations, and she ... tried to convince other students to support and believe her views.” Augusta State also explained in the initial remediation plan document why Keeton’s statements conflict with the university’s preferred viewpoints. Augusta State asserted that Keeton’s “statements *881 and actions are in direct conflict with the codes of ethics to which counselors and counselors-in-training are required to adhere.” Augusta State maintained that “the psychological research about GLBTQ populations asserts that sexual orientation is not a lifestyle or choice, but a ‘state of being.’ ” Augusta State explained that “research in psychological peer-reviewed journals ... reveals that conversion therapy is ineffective in changing [an] individual’s sexual orientation from same-sex attractions to opposite-sex attractiveness.” Augusta State concluded that Keeton’s “lack of awareness of how her beliefs may negatively impact future clients is of great concern.” Augusta State also explained that Keeton stated to professors that she held the disfavored belief that other people should share her moral and religious values:
Statements made in your recent emails have confirmed the faculty’s concern. In the June 14 email you said “My Christian moral views are not just about me. I think the Bible’s teaching is true for all people, and it shows the right way to live.” In the June 14 email, you indicated “I believe the Bible’s teachings applies [sic] to all people on who they are and how they should act ... from that I see that some behaviors are not moral or positive.”
These statements indicate that you think certain people should act in accordance with your moral values, and/or that your beliefs are in some way to [sic] superior to those of others. The belief that you possess a special knowledge about the way that other people should live their lives, and that others need to adopt a similar set of values contradicts the core principles of the American Counseling Association and American School Counselor Association Codes of Ethics, which define the roles and responsibilities of professional counselors.
These initial documents did not expressly tie the concerns of officials of Augusta State to Keeton’s participation in a clinical program.
But the record, as a whole, establishes that the district court did not abuse its discretion when it denied Keeton’s motion for a preliminary injunction. At this stage, the record supports the finding that Augusta State imposed the remediation plan to prevent Keeton from violating the rules of the clinical program. Immediately after Keeton refused to adhere to the remediation plan, Augusta State refused to allow Keeton to enroll in that program. Augusta State did not demand that Keeton change her beliefs or refrain from all expression of those beliefs.
Augusta State has the authority to require all students enrolled in its clinical practicum, which involves one-on-one interaction with actual counselees, to adhere to a code of ethics. In Watts v. Florida International University, 495 F.3d 1289, 1291-94 (11th Cir.2007), we ruled that a public university could terminate a graduate student from the clinical portion of a social work program when the student offered a patient advice about religion, in violation of the rules governing the program. The main distinction between Watts and Keeton’s appeal is that the student in Watts was already enrolled in the clinical program when he engaged in speech that the university deemed impermissible, but this distinction is immaterial as a matter of law in the context of this appeal. When a student expresses her intent to violate the rules of a state-sponsored clinical program, the university may require her to provide reasonable assurances that she will comply with its requirements before the university permits the student to participate in the clinical program.
*882 But we have never ruled that a public university can discriminate against student speech based on the concern that the student might, in a variety of other circumstances, express views at odds with the preferred viewpoints of the university. Our precedents roundly reject prior restraints in the public school setting. As Judge Wisdom wrote over forty years ago, ‘Wben the restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality.” Univ. of S. Miss. Chapter of the Miss. Civil Liberties Union v. Univ. of S. Miss., 452 F.2d 564, 566 (5th Cir.1971).
A few decades ago, the prevailing view of the psychiatric profession maintained that homosexuality was a treatable mental disorder. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (2d ed. 1968). As this record makes plain, the prevailing view changed. This shift in psychiatric orthodoxy occurred largely because professionals who had been taught that homosexuality was a disease of the mind, but who rejected that view, argued successfully that the psychiatric diagnostic criteria should be amended. See Herb Kutchins & Stuart A. Kirk, Making Us Crazy 55-77 (1997) (describing professional efforts to remove homosexuality as a mental disorder from the DSM-II)- This change in opinion would have taken much longer if public universities had been able to expel students who rejected the prevailing view and intended to argue that homosexuality was not a mental disease. As the First Amendment protected the professionals who successfully advocated against the then-prevailing view of the psychiatric profession, so too does it protect Keeton should she decide to advocate that those professionals got it wrong.
The decision of the Supreme Court in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), is instructive. In Hazelwood, the Supreme Court determined that public schools may regulate school-sponsored speech that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school when the regulation is reasonably related to legitimate pedagogical concerns. 484 U.S. at 271-73, 108 S.Ct. at 570-71. Hazelwood does not suggest that Augusta State can discriminate against Keeton’s speech because it will someday confer a degree upon her. Nor does Hazelwood permit a public university to retaliate against student speech whenever it occurs in a classroom. And Hazelwood does not allow retaliation against disfavored speech that occurs outside the classroom.
Although we have concluded that Hazel-wood allows a public university to “limit in-school expressions which suggest the school’s approval,” Bishop v. Aronov, 926 F.2d 1066, 1074 (11th Cir.1991), we have never held that Hazelwood permits a public university to punish a student’s expressions of opinion when the speech is not school-sponsored or does not suggest the school’s approval. As Justice Alito observed while serving on the Third Circuit, “Things that students express in class or in assignments when called upon to express their own views do not bear the imprimatur of the school, and do not represent the school’s own speech.” C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 214 (3d Cir.2000) (Alito, J., dissenting) (internal quotation marks and citations omitted). “The proposition that schools do not endorse everything that they fail to censor is not complicated.” Id. (internal quotation marks and citation omitted). Permitting broad regulation of student speech would be fundamentally at odds with the Su *883 preme Court’s command that “the college classroom with its surrounding environs is peculiarly the marketplace of ideas[.]” Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). We must keep in mind that “[t]he First Amendment ... does not tolerate laws that cast a pall of orthodoxy over the classroom.” Keyishian v. Bd. of Regents of Univ. of the State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).
Although federal courts owe no deference to universities when considering whether a public university has exceeded constitutional constraints, Christian Legal Soc’y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, — U.S. -, 130 S.Ct. 2971, 2987, 177 L.Ed.2d 838 (2010), we may not act as “ersatz deans or educators” by second-guessing regular academic methods of a public university. Bishop, 926 F.2d at 1075. “Cognizant that judges lack the on-the-ground expertise and experience of school administrators ... [the Supreme Court has] cautioned courts in various contexts to resist ‘substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.’” Martinez, 130 S.Ct. at 2988 (quoting Bd. of Ed. Of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051 (1982)). In matters of instruction and academic programs, federal judges must instead exercise restraint. Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225-26, 106 S.Ct. 507, 513-14, 88 L.Ed.2d 523 (1985) (“Considerations of profound importance counsel restrained judicial review of the substance of academic decisions.”).