Michael CHANDLER, individually and as next friend of his son, Jesse Chandler, et al., Plaintiffs-Appellees,

v.

Fob JAMES, Jr., in his official capacity as Governor of the State of Alabama and President of the State Board of Education, et al., Defendants-Appellants.

Nos. 97-6898, 97-6953.

United States Court of Appeals,

Eleventh Circuit.

July 13, 1999.

Appeals from the United States District Court for the Middle District of Alabama. (No. CV-96-D-169-N), Ira De Ment, Judge.

Before TJOFLAT, Circuit Judge, and GODBOLD and HILL, Senior Circuit Judges.

HILL, Senior Circuit Judge:

Plaintiffs brought this action challenging the facial constitutionality of Alabama's statute permitting non-sectarian, non-proselytizing student-initiated prayer, invocations and benedictions during compulsory or non-compulsory school-related assemblies, sporting events, graduation ceremonies and other school-related events. Plaintiffs also challenged the statute as applied by the DeKalb County School Board. The district court held the statute unconstitutional on its face, granted plaintiffs partial summary judgment on their claims regarding the statute as applied, and enjoined defendants from enforcing the statute or continuing to conduct the challenged practices. Defendants bring this appeal.

I.

In 1993, the Alabama Legislature enacted a statute containing the following provision:

(b) On public school, other public, or other property, non-sectarian, non-proselytizing student-initiated voluntary prayer, invocation and/or benedictions, shall be permitted during compulsory or non-compulsory school-related student assemblies, school-related student sporting events, school-related graduation or commencement ceremonies, and other school-related student events.

Ala.Code § 16-1-20.3(b) (1995).

In 1996, Michael Chandler, a vice-principal in the DeKalb County school system, and his son Jesse, a student in that system, brought this action challenging the facial validity and the application of this statute in the DeKalb County schools.[1] Defendants included the Governor of the State of Alabama, the State Superintendent of Education, the members of the State Board of Education, and the Superintendents and members of the boards of education of the City of Talladega and of DeKalb County, Alabama.[2]

On March 12, 1997, the district court granted partial summary judgment for the Chandlers, holding the statute facially unconstitutional. On October 29, 1997, the district court permanently enjoined DeKalb County from enforcing the statute. On November 12, 1997, the district court issued findings of fact and conclusions of law in its Supplemental Opinion and Order. That same day, but by separate Memorandum Opinion and Order, the district court held that DeKalb had engaged in unconstitutional officially organized or sponsored religious activities, and granted summary judgment to the Chandlers on their claim that DeKalb had applied the statute unconstitutionally. The district court appointed a monitor to oversee the enforcement of the Permanent Injunction. All defendants appealed from the Permanent Injunction, the Supplemental Opinion and Order, and the Memorandum Opinion and Order.

In his brief, the Governor of the State of Alabama asserts that the district court erred in holding the statute facially unconstitutional under the First Amendment. The Governor contends that the First Amendment's prohibition against the establishment of a religion does not apply to the states by virtue of the Fourteenth Amendment. The district court rejected this argument, as do we. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). *See also Everson v. Board of Educ.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Because the states are bound by the First Amendment, the district court did

---

[1]Also named as plaintiffs are Jane Doe and her daughter Deborah Doe.

[2]The Chandlers subsequently entered into a partial consent decree with the City of Talladega and the district court dismissed the Talladega defendants from the case in 1996.

not err in evaluating Alabama's statute under it. Accordingly, we shall affirm the judgment of the district court as to the Governor's appeal.[3]

The remainder of the appellants (referred to collectively as DeKalb) do not contest the district court's holding that the statute is facially unconstitutional, nor that the DeKalb County schools engaged in unconstitutional officially organized or sponsored religious activities. Therefore, we do not review the district court's determinations of these issues.

Neither does DeKalb appeal that portion of the Permanent Injunction entered by the district court which prohibits it from "aiding, abetting, commanding, counseling, inducing, ordering, or procuring ... school organized or officially sanctioned religious activity in its schools including, but not limited to, vocal prayer, Bible and devotional or scriptural readings, distribution of religious materials, texts, or announcements, and discussions of a devotional or inspirational nature, in school or at school-related events, to include assemblies, sporting events, and graduation ceremonies." Apparently, DeKalb concedes that, under Supreme Court precedent, it may not prescribe prayer or allow state employees to lead, participate in or otherwise endorse prayer of any type during curricular or extracurricular events.[4] *See Lee v. Weisman,* 505 U.S. 577, 586, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *County of Allegheny v. ACLU,* 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Doe v. Duncanville Indep. Sch. Dist.,* 70 F.3d 402 (5th Cir.1995).

The Permanent Injunction, however, also prohibits DeKalb from "permitting" vocal prayer or other devotional speech in its schools. While the injunction makes clear that it does not prohibit students from voluntarily praying while at school or at school-related events, either individually or with each other, so long as the prayer is purely *private,*[5] it prohibits all prayer or other devotional speech in situations which are not

---

[3]The Governor does not assert any other error by the district court. We do not decide whether the district court erred in holding the statute facially unconstitutional for any reason not presented to us.

[4]We do not, therefore, reach any of these issues.

[5]The Permanent Injunction recites that nothing in it should be read to "affect the rights of secondary-school students to engage in religious activity during noninstructional time that is consistent

3

purely private, such as aloud in the classroom, over the public address system, or as part of the program at school-related assemblies and sporting events, or at a graduation ceremony. Furthermore, the prohibition applies to bar not only school personnel from leading or participating in such public or vocal prayer or other devotional speech or Bible reading, but also *requires school officials to forbid students*[6] *or other private individuals from doing so while in school or at school-related events.*

DeKalb does appeal this portion of the Permanent Injunction. It contends that the district court may not constitutionally require it to forbid this speech, pointing out that the Supreme Court has made very clear that "[p]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).[7] "There is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Educ. of Westside Community Schools*

---

with the federal Equal Access Act, 20 U.S.C. Section 4071 *et seq.,* or to quietly engage in religious activity during noninstructional times." Permanent Injunction at 4.

[6]We shall refer to all non-government, private parties collectively as "students."

[7]The Departments of Justice and Education issued a statement of principles in the summer of 1995 "to provide school officials with guidance [concerning] the extent to which religious expression and activities are permitted in public schools." The first paragraph of the statement advises:

> Student prayer and religious discussion: The Establishment clause of the First Amendment does not prohibit purely private religious speech by students. Students therefore have the same right to engage in individual or group prayer and religious discussion during the school day as they do to engage in other comparable activity. For example, students may read their Bibles or other scriptures, say grace before meals, and pray before tests to the same extent they may engage in comparable non-disruptive activities. Local school authorities possess substantial discretion to impose rules of order and other pedagogical restrictions on student activities, but they may not structure or administer such rules to discriminate against religious activity or speech.

News Release of U.S. Dep't of Educ., Aug. 17, 1995, at 3.

4

*v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (quoting *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987)) (emphasis in original).

Even the Chandlers agree that "[t]he Establishment Clause does not ban prayer.  It bans *state* prayer." (Plaintiffs' Reply Brief) (emphasis in original).  They contend, however, that student-initiated religious speech in the public schools *is* state prayer, and, therefore, DeKalb may not permit it.

Our review of the Permanent Injunction, then, is limited to the issue of whether the district court may constitutionally enjoin DeKalb from permitting student-initiated religious speech in its schools.[8]  For the following reasons, we hold the court may not.  We vacate the Permanent Injunction and remand for further proceedings.

## II.

The district court's opinion holds that the Constitution requires it to prohibit public religious speech in schools because the Establishment Clause is violated if government permits religious speech—even if initiated by students—in schools or at school-related events.  DeKalb contends that this conclusion is wrong for two reasons.  First, students are not state actors and, therefore, by definition, their actions cannot tend to "establish" religion in violation of the Establishment Clause.  Second, the Free Speech and Free Exercise Clauses of the First Amendment require the State to *tolerate* genuinely student-initiated religious speech in schools.

*Students as State Actors and the Establishment Clause*

The Establishment Clause prohibits Congress—or any other governmental body—from acting in such a way as to establish a religion.  *Everson,* 330 U.S. at 8, 67 S.Ct. 504. DeKalb argues that because students are not state actors—Congress or a governmental body—their religious speech cannot, by definition, tend to establish a religion.

---

[8]DeKalb also appeals the district court's decision to appoint a monitor to enforce its injunction which we discuss below.

It is true that ordinarily religious speech by private parties cannot establish religion, even if it occurs in a public institution, such as a school. *Mergens,* 496 U.S. at 250, 110 S.Ct. 2356. On the other hand, it is clear that private parties' religious speech can violate the Establishment Clause if the State uses such parties as surrogates to accomplish what the State may not do. For example, if a school board may not constitutionally write and require students to recite a prayer, as it most assuredly may not, *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the school board may not avoid this prohibition by delegating this function to others. *Lee,* 505 U.S. at 577, 112 S.Ct. 2649 (invalidating school board policy permitting clergy to give prayers at graduation); *Karen B. v. Treen,* 653 F.2d 897 (5th Cir.1981) (invalidating school board guidelines which required student or teacher-led prayers in classrooms). Nor may the State establish a policy which "permits" private parties to speak, but then limits their speech to prayer or other devotional speech. *Ingebretsen v. Jackson Pub. Sch. Dist.,* 88 F.3d 274, 277 (5th Cir.1996) (authorizing *invocations, benedictions and prayers* ); *ACLU v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471 (3d Cir.1996) (school board policy permitted students to vote to have *prayer* at graduation); *Harris v. Joint Sch. Dist.,* 41 F.3d 447 (9th Cir.1994), *vacated as moot,* 515 U.S. 1155, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995) (school policy permitted student to lead *prayer* ); *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824 (11th Cir.1989) (authorizing student-led *invocations* and *only* invocations at school sporting events); *Hall v. Board of Sch. Comm'rs,* 656 F.2d 999 (5th Cir.1981) (school policy permitted *devotionals,* and only devotionals); *Collins v. Chandler Unified Sch. Dist.,* 644 F.2d 759, 760-61 (9th Cir.1981) (authorizing *invocations, benedictions,* and *prayers* only).

When the State *commands* religious speech, it steps over the Constitution to establish religion. In each of these cases, it is the *State's decision to create an exclusively religious medium* which violates the Establishment Clause; *not* the private parties' religious speech. It is not the "permitting" of religious speech which dooms these policies, but rather the *requirement* that the speech be religious, i.e., invocations, benedictions, or prayers.

6

This was the holding of the original school prayer case, *Engel v. Vitale,* in which the Court observed:

> The Petitioners contend among other things that the state laws requiring or permitting use of the Regents' prayer must be struck down as a violation of the Establishment Clause because that prayer was composed by governmental officials as a part of a governmental program to further religious beliefs. For this reason, petitioners argue, the State's use of the Regents' prayer in its public school system breaches the constitutional wall of separation between Church and State. We agree with that contention since we think that the constitutional prohibition against laws respecting an establishment of religion must at least mean that in this country *it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government.*

370 U.S. at 425, 82 S.Ct. 1261 (emphasis supplied). The Court held, therefore, that "government in this country, be it state or federal, is without power to *prescribe by law any particular form of prayer which is to be used as an official prayer* in carrying on any program of governmentally sponsored religious activity." *Id.* (emphasis supplied). This is all it held.

Some lower courts have extended *Engel* to require government to prohibit *any* public expression of religious belief in schools. Support for this holding is said to be located in the Court's observation that the denominational neutrality of the prayer did not "free it from the limitations of the Establishment Clause." *Id.* at 430, 82 S.Ct. 1261. These courts interpreted this to mean that *no* religious speech could be tolerated in the public schools because the Establishment Clause forbade it.

This is not what the Court said, however. The denominational neutrality of the Regent's prayer could not "free it from the limitations of the Establishment Clause" because the prayer was "commanded" by the State. It really did not matter what the prayer said; *no* prayer commanded by the State can survive scrutiny under the Establishment Clause.

The Court specifically cautioned that "nothing could be more wrong" than to interpret *Engel* to require "a hostility toward religion *or toward prayer.*" *Id.* at 434, 82 S.Ct. 1261 (emphasis supplied). On the contrary, "[t]he history of man is inseparable from the history of religion." The First Amendment, "which tried to put an end to governmental control of religion and of prayer, was not written to destroy either." *Id.* at 435, 82 S.Ct. 1261. Rather, it protects freedom of religious expression by forbidding *government* from

7

requiring us to "speak only the religious thoughts that government want[s][us] to speak and to pray only to the God that government want[s][us] to pray to." *Id.* The Court summarized its holding in *Engel* in the following way:

> It is neither sacrilegious nor antireligious to say that each separate *government in this country should stay out of the business of writing or sanctioning official prayers* and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance.

*Id.* (emphasis supplied). Thus, *Engel* merely made clear that the Establishment Clause prohibits the government from commanding prayer and prescribing its form.[9]

But DeKalb does not claim otherwise. DeKalb contends only that nothing in the First Amendment, nor in any of the Supreme Court's interpretations of it, requires it to prohibit the religious speech of private parties—such as students—if that speech is genuinely privately-initiated, i.e., not commanded by a school board or state law. On the contrary, DeKalb argues, the First Amendment positively *requires* that it tolerate students' religious speech to the same extent that it permits students' secular speech.

The Chandlers, on the other hand, contend that when the State permits students to speak religiously in situations that are not purely private,[10] the State lends its imprimatur to the speech, thereby endorsing and advancing religion in violation of the "obligation of the public schools to provide a religiously neutral environment." They also argue that all public religious speech in schools is unconstitutionally coercive of some students because of "peer pressure." Consequently, schools must forbid all public religious speech in school, including genuinely student-initiated religious speech.

*Student Speech and the Free Exercise and Free Speech Clauses*

This, then, is the question DeKalb asks us to answer. Do school officials have "the ability (and duty) to impose content restrictions on purportedly 'private' speakers at school events," in order to achieve neutrality

---

[9]The opt-out provision of the school board's policy was constitutionally insignificant in the context of "governmentally composed prayers for religious services" in schools. 370 U.S. at 425, 82 S.Ct. 1261.

[10]The Permanent Injunction, for example, permits students to "quietly engage in religious activity during noninstructional times, so long as it does not unduly call attention thereto."

8

with respect to religion as the Chandlers contend (Chandlers' Brief at 27);  or do the Free Exercise and Free Speech Clauses require that school officials permit student religious speech at the same time, and in the same place and manner as secular speech, as DeKalb contends?  Under the Chandlers' theory, student religious speech is attributable to the State thereby violating the constitutional requirement of neutrality.  Students, therefore, cannot be permitted to speak freely in school if religion is the topic;  the State has a positive duty to censor student speech if it is religious.

We disagree.  The suppression of student-initiated religious speech is neither necessary to, nor does it achieve, constitutional neutrality towards religion.  For that reason, the Constitution does not permit its suppression.

It is true that government must be neutral with respect to religion.  But it is equally true, as Justice Goldberg warned, that an:

> untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive dedication to the secular and a passive, or even active, hostility to the religious.  Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.

*School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 306, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J. concurring).

The discriminatory suppression of student-initiated religious speech demonstrates not neutrality but hostility toward religion because the:

> exclusion of religious ideas, symbols, and voices marginalizes religion....  Silence about a subject conveys a powerful message.  When the public sphere is open to ideas and symbols representing nonreligious viewpoints, culture, and ideological commitment, to exclude all those whose basis is "religious" would profoundly distort public culture.

Michael W. McConnell, Religious Freedom at a Crossroads, 59 U. Chi. L.Rev. 115, 189 (Winter 1992).

The prohibition of all religious speech in our public schools implies, therefore, an unconstitutional *disapproval* of religion.  If endorsement is unconstitutional because it "sends a message to nonadherents that they are outsiders," disapproval is unconstitutional because it "sends the opposite message." *Lynch,* 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring).  "What is crucial is that a government practice not have the effect of communicating a message of government endorsement *or* disapproval of religion." *Id.* at 692,

104 S.Ct. 1355 (emphasis supplied). "Cleansing" our public schools of all religious expression, however, inevitably results in the "establishment" of disbelief—atheism—as the State's religion. Since the Constitution requires neutrality, it cannot be the case that government may prefer disbelief over religion.[11]

Permitting students to speak religiously signifies neither state approval nor disapproval of that speech. The speech is not the State's—either by attribution or by adoption. The permission signifies no more than that the State acknowledges its constitutional duty to tolerate religious expression. Only in this way is true neutrality achieved.

Because genuinely student-initiated religious speech is private speech endorsing religion, it is fully protected by both the Free Exercise and the Free Speech Clauses of the Constitution. *See Mergens,* 496 U.S. at 250, 110 S.Ct. 2356; *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963 (5th Cir.1992). "Students do not shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Religious speech by students does not become forbidden "state action" the moment the students walk through the schoolhouse door.

Furthermore, the Supreme Court has made clear that permitting religious speech or symbols in our public institutions does not automatically constitute an unconstitutional State endorsement of religion. In fact, "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly,* 465 U.S. 668, 674, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). References to our religious heritage are found in the statutorily prescribed national motto on our currency, "In God We Trust," 36 U.S.C. § 186, and in the language "one nation under God," which is part of the Pledge of Allegiance to our flag—recited by public school children every day. Congress

---

[11]We believe that the First Amendment's requirement that government "tolerate" diverse political views, including those that are totally antithetical to our constitutionally guaranteed republican form of government, applies to require that government "tolerate" atheistic views without also requiring that we eschew religion. Tolerance of disbelief does not require that we deny our religious heritage, nor elevate atheism over that heritage. The First Amendment requires only that the State tolerate both, while establishing neither. Americans, however, are free to prefer one or the other and to express that preference wherever they are permitted to speak. This means, of course, that a student may choose to express his atheistic views as well as his religious ones.

opens with a prayer, and, indeed, the Supreme Court, itself, hears oral argument in a chamber decorated with a depiction of Moses and the Ten Commandments. We celebrate Thanksgiving and Christmas as national holidays, and Congress has directed the President to proclaim a National Day of Prayer each year "on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 169h.

The Constitution does not require a complete separation of church and state such that religious expression may not be tolerated in our public institutions.[12] In fact, "it affirmatively mandates *accommodation,* not merely tolerance, of all religions, and forbids hostility toward any." *Lynch,* 465 U.S. at 673, 104 S.Ct. 1355 (emphasis supplied). The Supreme Court has made clear that "[a]nything less would require the 'callous indifference' we have said was never intended by the Establishment Clause," and "would bring us into 'war with our national traditions as embodied in the First Amendment's guaranty of the free exercise of religion.' " *Id.* (quoting *McCollum v. Board of Education,* 333 U.S. 203, 211-12, 68 S.Ct. 461, 92 L.Ed. 649 (1948)).

The examples cited above all "evidence [our] accommodation of all faiths and all forms of religious expression, and hostility toward none. Through this accommodation ... governmental action has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people.' " *Lynch,* 465 U.S. at 677-78, 104 S.Ct. 1355 (quoting *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952)).

___

[12]In fact, the Constitution probably does not require a "wall" at all. The phrase comes from a letter written by Jefferson who was neither present when the First Amendment was passed, nor consulted about its language. In a short note to the Danbury Baptist Association written fourteen years after the Bill of Rights was passed, he made a passing reference to idea that the First Amendment "build[s] a wall of separation between church and State." *See Wallace v. Jaffree,* 472 U.S. 38, 92, 105 S.Ct. 2479, 86 L.Ed.2d 29 (Rehnquist, J., dissenting). In any event, the "wall" concept has been acknowledged by the Court itself, with what Justice Rehnquist characterized as "embarrassing candor," as merely a "blurred, indistinct, and variable barrier," which "is not wholly accurate" and can only be "dimly perceived." *Id.* at 107, 105 S.Ct. 2479 (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).

Genuinely student initiated religious speech can also be accommodated without resulting in an unconstitutional State endorsement of religion.

Furthermore, even if permitting student-initiated religious speech advances religion in some sense, this does not mean the speech violates the Establishment Clause. Even *State* action may incidentally advance religion without offending the Constitution. *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The Supreme Court has recognized that "our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action." *Lynch,* 465 U.S. at 683, 104 S.Ct. 1355. "Not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." *Id.* (quoting *Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)). Student-initiated religious speech, therefore, even if it incidentally advances religion, does not violate the Establishment Clause because it is private speech endorsing religion which the First Amendment protects. *See Clear Creek,* 977 F.2d at 965.

Finally, the fact that student religious speech may fall on deaf ears does not make it unconstitutionally coercive. *Lee,* 505 U.S. at 577, 112 S.Ct. 2649. In *Lee,* the Supreme Court was careful to point out that:

> We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation. We know too that sometimes to endure social isolation or even anger may be the price of conscience or nonconformity.

505 U.S. at 597, 112 S.Ct. 2649.[13] Those who do not espouse a speaker's religious beliefs are free not to listen, and to express their disagreement by not participating in any way.

Accommodation of religious beliefs we do not share is, however, a part of everyday life in this country:

> In so acting, we express respect for, but not endorsement of, the fundamental values of others. We act without expressing a position on the theological merit of those values or of religious belief in general, and no one perceives us to have taken such a position.

---

[13]Of course, in this case we do not have state action. Private religious speech has even less potential for coercion.

12

*Lee,* 505 U.S. at 628, 112 S.Ct. 2649 (Souter, J. concurring). Respect for the rights of others to express their beliefs, both political and religious, is the price the Constitution extracts for our own liberty.[14] This is a price we freely pay. It is not coerced.[15] Only when the speech is commanded by the State does it unconstitutionally coerce the listener.[16]

Ultimately, the issue in this case is not whether school officials may prescribe prayer or enlist surrogates to that end. They may not. Nor is the issue whether school officials may prohibit religious speech in schools, or censor the content of that speech. They may not. The real issue is what sort of time, place, and manner limits may be imposed upon genuinely student-initiated religious speech in schools? When may students pray? Where may they pray? Under what circumstances may they pray?

In answering these questions, we must fulfill the constitutional requirement of *permitting* students freely to express their religious beliefs without allowing the machinery of government—the school—to be used to command prayer. This requires that we resolve the tension between the right to pray and the right to be free from government-mandated prayer. This is not an easy task. It would be easy simply to banish

---

[14]Justice Scalia observed in *Lee* that "We indeed live in a vulgar age. But surely 'our social conventions,' have not coarsened to the point that anyone who does not stand on his chair and shout obscenities can reasonably be deemed to have assented to everything said in his presence.... I may add, moreover, that maintaining respect for the religious observances of others is a fundamental civic virtue that government (including the public schools) can and should cultivate—so that even if it were the case that the displaying of such respect might be mistaken for taking part in the prayer, I would deny that the dissenter's interest in avoiding even the false appearance of participation constitutionally trumps the government's interest in fostering respect for religion generally." 505 U.S. at 637-38, 112 S.Ct. 2649 (Scalia, J. dissenting).

[15]Justice Souter acknowledged this in *Lee:* "If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State. But that is not our case." 505 U.S. at 630 n. 8, 112 S.Ct. 2649.

[16]The "indirect coercion" identified in *Lee* by the plurality opinion was exerted over the audience by the *State* 's command that there be religious speech at graduation. 505 U.S. at 592-93, 112 S.Ct. 2649. Justice Kennedy's concern that "*in the hands of government* what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce," *id.* at 591-92, 112 S.Ct. 2649 (emphasis supplied), does not apply to the case of student-initiated religious speech.

prayer from our public institutions, but this would be not only constitutionally incorrect, but also fundamentally unfair to our society.

III.

How, then, does a school accommodate religious expression without commanding it? DeKalb argues that the answer is simple—it is to be "permitted." Not required. Not commanded. Not even suggested. Simply, permitted. If students, or other private parties, wish to speak religiously while in school or at school-related events, they may exercise their First Amendment right to do so.

The first principle must always be that genuinely student-initiated religious speech must be *permitted.* A student's individual decision to pray or otherwise speak religiously is not the State's command. *Clear Creek,* 977 F.2d at 965.[17] Such speech is fully protected. *Id. See also Mergens,* 496 U.S. at 252, 110 S.Ct. 2356.

On the other hand, even genuinely student-initiated religious speech may constitute state action if the State *participates in or supervises* the speech. *See Duncanville,* 70 F.3d at 406-07.[18] Religious speech in school by teachers, for example, is especially troublesome because "a teacher's [religious] speech can be

---

[17]The Ninth Circuit also upheld a policy that permitted the top four students to speak on any topic of their choosing without state approval in *Doe v. Madison Sch. Dist.,* 147 F.3d 832 (9th Cir.1998), but the court en banc ordered the district court to dismiss the complaint for lack of standing and mootness. No. 97-35642 (9th Cir. May 19, 1999).

[18]While many subsequent courts have cited *Duncanville* for the proposition that student initiated speech at school-related sporting events is *un*constitutional, the Fifth Circuit specifically held that, "[s]tudents *may voluntarily pray together,* provided such prayer is not done with school participation or supervision." 70 F.3d at 405 (emphasis supplied). Judge Jones, in her separate concurrence and dissent, pointed out that:

> This decision ... does not prevent students from exercising their constitutional rights of free speech, association and free exercise by praying at appropriate times and in an appropriate manner during athletic practices or games. Further, we must abide by the Supreme Court's decisions ... that prevent active school leadership, encouragement or promotion of the prayers. The only questions here are how teachers may respond to student-initiated prayers and to what extent the school may "supervise" the prayers.

70 F.3d at 409.

14

taken as directly and deliberately representative of the school." *Bishop v. Aronov,* 926 F.2d 1066, 1073 (11th Cir.1991). Teacher participation in student-initiated prayer "improperly entangles the State in religion and signals an unconstitutional endorsement of religion." *Duncanville,* 70 F.3d at 406. In upholding the Equal Access Act, which provides that schools must afford religious groups the same access to school facilities as secular groups enjoy, the Supreme Court relied in part on the act's express prohibition on teacher participation which "avoids the problems of the 'students' emulation of teachers as role models.' " *Mergens,* 496 U.S. at 251, 110 S.Ct. 2356 (quoting *Edwards,* 482 U.S. at 584, 107 S.Ct. 2573). Therefore, student religious speech must be without oversight, without supervision,[19] subject only to the same reasonable time, place, and manner restrictions as all other student speech in school.

Because religious speech is protected speech, government may not censor its content. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)) (the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses). Suppression of religious speech constitutes viewpoint discrimination, the most egregious form of content-based censorship. *Rosenberger v. Rector & Visitors of*

---

[19]What constitutes "supervision?" As Judge Jones wrote in *Duncanville:*

> At a broad level, everything that goes on during practice or competition, including student-initiated locker-room or basketball court prayer, is subject to the coaches' "supervision." To outlaw supervision on this level would be to outlaw the otherwise constitutional student-led prayers.... It must be, then, that the injunction pertains only to active supervision and is thus redundant of the cautions that the school may not promote, encourage or lead prayers.

70 F.3d at 410.

> Supervision cannot mean, therefore, mere presence. Support for this view is found in *Mergens* in which the Supreme Court found no constitutional infirmity with the provision of the EAA which permits school employees to be present for custodial purposes at religious meetings held on school property. 496 U.S. at 236, 110 S.Ct. 2356. We agree with Judge Jones that, for supervision to amount to unconstitutional endorsement, it must cross the line into active endorsement, encouragement or participation.

*Univ. of Va.,* 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Government may not, therefore, censor religion from the content of students' protected speech at school. *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are *viewpoint neutral.*") (emphasis supplied); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (A "state may reserve the [nonpublic] forum for its intended purposes ... as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.")

A student's right to speak religiously is not, however, without limit. The school may impose the same reasonable restrictions on the time, place, and manner of religious speech as it does on secular student speech. Furthermore, a student's right to express his personal religious beliefs does not extend to using the machinery of the state as a vehicle for converting his audience. *See Abington,* 374 U.S. at 228, 83 S.Ct. 1560. The Constitution requires that schools permit religious expression, not religious proselytizing. "The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee,* 505 U.S. at 587, 112 S.Ct. 2649. Proselytizing speech is inherently coercive and, the Constitution prohibits it from the government's pulpit. *Id.*

IV.

The Permanent Injunction enjoins DeKalb from "aiding, abetting, commanding, counseling, inducing, ordering, or procuring" school organized or officially sanctioned religious activity. DeKalb does not appeal this prohibition. The record in this case reveals, however, that there were many sincere, but unconstitutional efforts by school personnel to do just what the injunction prohibits—to endorse, encourage, or participate in student religious activity. For this reason, the appointment of a monitor by the district court was not an abuse of discretion. *See Local 28 of the Sheet Metal Workers' Int'l v. EEOC,* 478 U.S. 421, 481-

16

82, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). The monitor's task is to be vigilant in guarding against the repetition of this unconstitutional activity by the schools.

The Permanent Injunction also forbids DeKalb from "permitting" students to speak religiously. This it cannot constitutionally do. So long as school personnel do not participate in or actively supervise student-initiated speech, DeKalb cannot constitutionally prohibit students from speaking religiously and the Permanent Injunction cannot require it to.

We do not undertake to re-write the Permanent Injunction. The district court is in the best position to do that. We note only that the Permanent Injunction may neither prohibit genuinely student-initiated religious speech, nor apply restrictions on the time, place, and manner of that speech which exceed those placed on students' secular speech.[20]

Accordingly, the Judgment of the district court is AFFIRMED as to the Governor's appeal. As to the remaining defendants' appeals, the Permanent Injunction is VACATED and the case is REMANDED for further proceedings not inconsistent with this opinion.

TJOFLAT, Circuit Judge, specially concurring:

I agree wholeheartedly with the majority's analysis in this case. I write separately, however, to emphasize a more fundamental error made by the district court. I believe that many provisions of the injunction entered by the district court were entered in violation of basic principles of equity jurisprudence and constitutional law—namely, the principle that equity will not intervene where there is an adequate remedy at law and the constitutional principle of separation of powers. These principles, for reasons that will be explained hereafter, lead to the conclusion that a court should not enter an injunction that cannot be

---

[20]This includes restrictions on announcements permitted in the schools' commencement programs, and the distribution of religious literature.

17

enforced through coercive contempt sanctions. Some of the injunctive provisions at issue here cannot be so enforced, and therefore must be vacated.[1]

In part I of this concurrence, after recognizing that injunctions are enforced through contempt sanctions, I discuss the types of contempt sanctions generally available to a judge. I then explain that the types of contempt sanctions available to address a violation of a particular injunction depend on the nature of the injunction; not all types of sanctions are available for all injunctions. Finally, I explain why, based on equitable and constitutional considerations, an injunction should be entered as a form of relief for a party to a lawsuit only when one type of contempt sanction—coercive—is potentially available for violations. Part II then applies this rule to the facts of this case.

## I.

Injunctions are enforced through contempt sanctions. *See* 18 U.S.C. § 401(3) (1994). When it comes to a judge's attention that an individual may not be in compliance with an injunction he has entered, he holds a "show cause" hearing at which the allegedly noncomplying individual is asked to show cause why he is disobeying the injunction. If the individual is in fact disobeying the injunction, and he is unable to provide an acceptable excuse for doing so, then he is subject to the contempt powers of the court.[2] In this part, I discuss the types of contempt sanctions available to a court, and then discuss how this should impact the court's decision whether to grant injunctive relief in the first instance.

## A.

Contempt sanctions take one of three forms: punitive, compensatory, or coercive. Punitive sanctions punish the contemnor for his conduct, and are imposed for the purpose of vindicating the authority of the

---

[1]The issues I discuss herein were properly not relied upon by the majority opinion for the simple reason that they were not raised by the appellants either in the district court or on appeal. They are, however, sufficiently important to our system of jurisprudence that I feel it is appropriate—indeed necessary—to address them *sua sponte* in this concurrence.

[2]This procedure is laid out in more detail in *Wyatt v. Rogers,* 92 F.3d 1074, 1078 n. 8 (11th Cir.1996).

court. *See Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911).[3] For instance, if an individual is served with a subpoena duces tecum but refuses to produce the requested documents, and the court subsequently holds him in contempt and imposes a flat fine of $50 (payable to the court) for his contempt, the contempt sanction is properly classified as punitive. *See Penfield Co. of Cal. v. SEC,* 330 U.S. 585, 592-93, 67 S.Ct. 918, 922, 91 L.Ed. 1117 (1947). In such a situation, the opposing party is provided no relief, because it gets neither the requested documents nor the proceeds from the fine. Furthermore, the contemnor has no way to purge the contempt (in other words, avoid the fine); if he produced the requested documents five minutes after the court's decision, he would still be required to pay $50. The sanction in such a case is intended to punish the contemnor for his contempt, thereby vindicating the court's authority and thus deterring the contemnor and others from violating subsequent judicial orders (issued by the same or any other court). Punitive sanctions are criminal in nature and therefore many of the constitutional protections available in criminal proceedings—including the presumption of innocence, the privilege against self-incrimination, the right to counsel, and the right to a jury trial in serious cases—must be provided to the alleged contemnor before such sanctions can be imposed. *See Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 798-99, 107 S.Ct. 2124, 2133, 95 L.Ed.2d 740 (1987).[4]

The second form of contempt sanction is compensatory. Compensatory sanctions are civil in nature and compensate the plaintiff for the damage caused by the contemnor's contempt. *See United States v. United*

---

[3]The principles set forth in *Gompers* have been recently reaffirmed in *International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 826-29, 114 S.Ct. 2552, 2556-58, 129 L.Ed.2d 642 (1994).

[4]As stated in *Young:*

> [D]efendants in criminal contempt proceedings must be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves; must be advised of charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses; must be given a public trial before an unbiased judge; and must be afforded a jury trial for serious contempts.

*Young,* 481 U.S. at 798-99, 107 S.Ct. at 2133 (citations omitted).

*Mine Workers of Am.,* 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The contempt sanction in the well-known case of *Jones v. Clinton,* 36 F.Supp.2d 1118 (E.D.Ark.1999), falls into this category. In that case, the court, having found that the defendant gave false deposition testimony, held the defendant in contempt. The punishment for the contempt was a payment to the plaintiff of the expenses (including attorney's fees) caused by the false testimony. *See id.* at 1134-35. Compensatory sanctions, unlike punitive sanctions, provide a direct benefit to the plaintiff. Like punitive sanctions, however, the contemnor is unable to purge his contempt: Were President Clinton now to amend his deposition answers to make them completely accurate, the contempt sanctions would nevertheless remain in force.

The third form of contempt sanction is coercive. Coercive sanctions are also civil in nature, and are intended to coerce the contemnor into doing an act that he is already required to do, but refuses to perform. *See Gompers,* 221 U.S. at 441-42, 31 S.Ct. at 498. Thus, to use the previously cited example from *Penfield,* if the district court had ordered the recipient of the subpoena duces tecum to pay a fine of $50 per day for every day the recipient failed to produce the requested documents, such a sanction would be coercive.[5] Coercive sanctions benefit the plaintiff by pressuring the defendant into performing an action that the plaintiff desires to have performed. *See id.* at 442, 31 S.Ct. 492, 31 S.Ct. at 498. They also give the contemnor the opportunity to purge his contempt: The punishment continues only as long as the contemnor refuses to comply with the relevant court order. Hence, in regard to coercive sanctions, it is often said that a contemnor carries the key to his prison in his own pocket. *See, e.g., Blalock v. United States,* 844 F.2d 1546, 1559 (11th Cir.1988) (Tjoflat, J., specially concurring) (quoting *In re Nevitt,* 117 F. 448, 461 (8th Cir.1902)).

The lines separating each type of sanction from the others are not always clear. Consider a situation in which a court imposes a $150 contempt sanction on a party, payable to the adverse party but in no way correlated to the harm suffered by that party. The fact that the sanction is payable to the adverse party (and

---

[5]The fine would presumably be paid to the court, although in theory it could be paid to the opposing party. Regardless of who received the money, because the clear purpose of the fine would be to pressure the contemnor into compliance, the fine would be classified as coercive.

not the court) makes the sanction appear compensatory, but the fact that the amount of the sanction is unrelated to the harm suffered by the adverse party leads to the conclusion that the sanction is in fact punitive. *Cf. Thyssen, Inc. v. S/S Chuen On,* 693 F.2d 1171, 1173-74 (5th Cir.1982). Furthermore, every contempt sanction serves to some degree to vindicate the authority of the court (and thus is somewhat punitive) and to dissuade the contemnor from repeating his misbehavior (and thus is somewhat coercive). *See Gompers,* 221 U.S. at 443, 31 S.Ct. at 498. One might argue that this fact renders meaningless the distinctions among the types of contempt sanctions—for instance, because all contempt sanctions are somewhat punitive, it makes no sense to distinguish punitive contempt sanctions from the other two types of contempt sanctions. This, however, is the equivalent of arguing that because all men have facial hair, it makes no sense to distinguish between bearded and non-bearded men. In both cases, the question is one of degree, and the fact that there will be difficult cases at the margins does not deprive the conceptual categories of their significance. Instead, difficult cases merely require a detailed "examination of the character of" the sanction being imposed in order to determine whether it is punitive, compensatory, or coercive. *Hicks v. Feiock,* 485 U.S. 624, 636, 108 S.Ct. 1423, 1432, 99 L.Ed.2d 721 (1988).

B.

The types of sanctions—punitive, compensatory, or coercive—that can be used to enforce an injunction depend on the character of the conduct being enjoined. Consider first an injunction that commands the performance of a specific act. For instance, imagine a case in which the defendant operates a paper mill that is discharging pollutants onto the plaintiff's land. The plaintiff brings a lawsuit alleging a nuisance, and seeks an injunction ordering the defendant to shut down the mill. The plaintiff succeeds and the injunction is granted. The defendant, however, continues to operate the paper mill. The court, after conducting a show cause hearing and finding the defendant in contempt, could use any of the types of sanction previously discussed: a punitive sanction (such as a flat fine of $10,000), a compensatory sanction (such as a fine of

21

$5,000, which is roughly equal to the harm caused, payable to the plaintiff), or a coercive sanction (such as a fine of $100 per day until the paper mill is shut down).

Next, consider an injunction that forbids the performance of a specific act. For instance, imagine a case in which an employee alleges that her corporate employer, through the actions of its CEO (who is also the majority shareholder), has, on a number of occasions, touched her in inappropriate areas. The employee claims that this behavior constitutes sexual harassment, in violation of 42 U.S.C. § 2000e-2(a)(1) (1994).[6] She files a lawsuit against her employer, seeking an injunction ordering the employer to cease the harassment.[7] She succeeds, and the injunction is granted. Nevertheless, the CEO continues the inappropriate touching. The court, after conducting a show cause hearing and finding the employer in contempt, can assess punitive sanctions (such as a flat fine of $10,000, payable to the court) or compensatory sanctions (such as a fine equal to the harm caused, payable to the employee). Coercive sanctions, however, are not available, because the act to be prevented by the injunction has already occurred—in other words, there is no way to purge the contempt.[8] *See Gompers,* 221 U.S. at 442, 31 S.Ct. at 498 ("[I]f the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. [Contempt sanctions] cannot undo or remedy what has been done....").

---

[6]The employee's claim would be that the CEO had created an "abusive work environment," as opposed to a claim of quid pro quo sexual harassment. *See generally Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (discussing "abusive work environment" claims).

[7]Injunctions of this sort actually amount to nothing more than injunctions to "obey the law," which, for reasons different from those outlined here, have repeatedly been held invalid. *See, e.g., Payne v. Travenol Labs., Inc.,* 565 F.2d 895, 897-98 (5th Cir.1978) (holding that injunctions to "obey the law" violate the requirements of Fed.R.Civ.P. 65(d) that an injunction "be specific" and "describe in reasonable detail ... the act or acts sought to be restrained"). (In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.)

[8]The situation might be different depending on the nature of the harassment. For instance, if the harassment consisted in part of the placement of pornographic pictures throughout the office, the employee could seek an injunction ordering that the pictures be removed. If the injunction was granted, it could be enforced through coercive sanctions—for instance, a fine of $200 per day until the pictures were removed.

22

To make the point clearer, try to imagine a court attempting to enter coercive sanctions in the situation outlined above. The court has enjoined the employer not to harass the employee. The employer nevertheless does so, and, after a show cause hearing, is held in contempt. The court fines the employer $100 per day until ... well, until what? Presumably, until the court is persuaded that the harassing CEO will not repeat his misbehavior. Thus, after three days of fines, the CEO contacts the judge and promises that he will never again sexually harass the employee. The court thinks the CEO was shifting his eyes a bit much when he made the promise, however, and therefore allows the fines to continue accumulating. After a week of fines, the CEO makes the same promise, but this time on his knees and with his hands clearly visible so that the court can see that the CEO's fingers are not crossed. The court is still unpersuaded, and continues allowing the fines to accrue. This exercise would presumably continue until such time as the court, for whatever reason, decided that the CEO had learned his lesson.[9] Even then, the contempt would not have been purged, because the harassment would already have been fully accomplished. The point is simply that when an injunction forbids the performance of an act, coercive sanctions are not available to enforce the injunction.

Note that it is not the affirmative or negative phrasing of the injunction that is critical. An injunction commanding the performance of specific act (for instance, "shut down the paper mill") could, in many cases, just as easily be phrased as an injunction prohibiting a ongoing harm (for instance, "do not operate the paper mill"). Likewise, an injunction forbidding the performance of a specific act (for instance, "do not sexually harass the employee") could, in many cases, be phrased as an injunction commanding the performance of an ongoing duty (for instance, "treat male and female employees equally"). *Cf. International Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 835, 114 S.Ct. 2552, 2561, 129 L.Ed.2d 642 (1994) (suggesting that an injunction directed at a union stating, "Do not strike," is essentially the same as one stating, "Continue working"). Rather, it is the underlying nature of the injunction—specifically, whether it

---

[9]In contrast, where the contemnor is enjoined to perform a specific act, promises of future compliance are neither necessary nor relevant—the contemnor can avoid sanctions by (and only by) performing the commanded act.

23

is commanding an act that the law requires or proscribing an act that the law forbids—that determines whether it can be enforced through coercive sanctions.

In sum, if an injunction commands the performance of a specific act (such as shutting down a paper mill), then all three types of sanctions are available to the court. If, however, an injunction forbids the performance of an act (such as sexually harassing an employee), then only punitive and compensatory sanctions are available to the court.

C.

The types of contempt sanctions available for violation of an injunction determine the effectiveness of the injunctive relief being given to the plaintiff. Specifically, as I discuss in this section, injunctions that are enforceable only through punitive and compensatory sanctions provide relief to a plaintiff that is—at best—duplicative of the relief available through an action for damages.[10] Only injunctions enforceable through coercive sanctions provide a form of relief that is unique to equity. They are therefore the only type of injunctions that courts should enter, on the basis of the rule that injunctions should not be granted where the plaintiff has an adequate remedy at law. *See Weaver v. Florida Power & Light Co.,* 172 F.3d 771, 773 (11th Cir.1999).

Punitive sanctions provide essentially no relief to the plaintiff—as discussed above, the purpose of punitive sanctions is to vindicate the court's authority, not to benefit a party to a lawsuit. Any benefit to the plaintiff from such a sanction is incidental and indirect. For instance, in the sexual harassment hypothetical in part I.B, *supra,* assume that the court chose to impose a punitive sanction—such as a fine of $10,000 against the employer, payable to the court. This fine would do nothing to affect the harassment that had already occurred; at this point, the harassment is a "done deal" and the court cannot undo it. In addition, the fine would do nothing to compensate the plaintiff for the harm caused by the harassment. The only benefit

---

[10]This is not to say that punitive and compensatory sanctions should never be used to enforce injunctions. Some examples of their proper use will be discussed in part I.E, *infra.*

provided to the plaintiff from the fine would be a deterrent: Because of the imposition of the fine, the employer might be less inclined to harass the plaintiff in the future. This deterrent, however, is equally available to the plaintiff through an action for damages: If, instead of seeking an injunction and then calling for a show cause hearing at which the employer was assessed punitive sanctions, the plaintiff had simply brought a damages action after the harassment occurred, the employer would be equally deterred. (Furthermore, the plaintiff would receive compensation for the harm caused, unlike in the injunction scenario.) In sum, every benefit that the plaintiff gets from an injunction enforced by punitive sanctions would be equally available in an action for damages.

Compensatory sanctions merely imitate the relief that would be provided in a damages action. For instance, returning to the sexual harassment example, assume that the court chose to impose a compensatory sanction on the employer. The court, after hearing argument from both parties, determined that the damage to the plaintiff from the harassment was roughly $5,000, and ordered the employer to pay that amount to the plaintiff. The fine does not affect the prior harassment (it is again a "done deal"), but compensates the plaintiff for the harm she has suffered. In this situation, the relief provided to the plaintiff imitates that which would be provided in a damages action—in terms of both compensation to the plaintiff and as a future deterrent to the employer. Again, as with punitive sanctions, every benefit that the plaintiff gets from an injunction enforced by compensatory sanctions would be equally available from an action for damages.

Coercive sanctions, in contrast, provide meaningful and unique relief to the plaintiff. For instance, using the paper mill hypothetical from part I.B, *supra,* assume that the court chose to impose a fine of $100 per day on the defendant until he shut down the paper mill. The defendant is now subject to an ever-increasing pressure to take the action that the plaintiff seeks—a pressure that would not be available through an ordinary damages action. There is of course still no guarantee that the defendant will shut down the mill, but, because of the injunction, the plaintiff is able to exert greater pressure on the defendant to do so than would be possible in the absence of the injunction.

These observations lead to the conclusion that where an injunction is enforceable only through punitive or compensatory contempt sanctions,[11] and not through coercive contempt sanctions, the injunctive remedy being given to the plaintiff is no better than the remedy he could have obtained in an after-the-fact action for damages. Therefore, the plaintiff necessarily has an adequate remedy at law—or at least a remedy at law that is no less adequate than the injunctive remedy.[12] Consequently, the principle that an injunction will not be entered where the plaintiff has an adequate remedy at law forbids the entering of an injunction under such circumstances.

D.

In addition to violating equitable principles, an injunction that is enforceable only through punitive or compensatory sanctions may also violate the Constitution. Specifically, such an injunction has the potential to run afoul of the constitutional doctrine of separation of powers.

---

[11]As discussed in part I.B, *supra,* injunctions are enforceable only through punitive or compensatory contempt sanctions when they forbid the performance of an act (or command the performance of an ongoing duty).

[12]An injunction enforceable only through punitive or compensatory sanctions does give a plaintiff one benefit that a damages action cannot provide: an *ex ante* declaration of the rights of the parties. For instance, consider a case in which the defendant is preparing to remove some trees from a plot of land. The plaintiff, asserting that the land is his, seeks an injunction (based on the law of trespass) forbidding the defendant from removing the trees. The plaintiff succeeds and the injunction is issued. The defendant, having previously believed that the land was his, may now be persuaded to change his behavior. Thus, although the injunction would not be enforceable through coercive contempt sanctions (because it forbids the performance of an act), it would nevertheless have provided the plaintiff with meaningful relief in the form of an *ex ante* declaration of rights. If, however, this is the *only* form of relief being provided to the plaintiff, then the appropriate remedial vehicle is a declaratory judgment, not an injunction. *See* 28 U.S.C. § 2201 (1994).

> The distinction is not merely a formal one: Injunctions, unlike declaratory judgments, implicate the court's contempt powers and thus subject the enjoined party to sanctions should he disobey. Declaratory judgments therefore do not raise the same separation-of-powers concerns as injunctions, as discussed in part I.D, *infra.*

An injunction forbidding the performance of a particular act must be based on a conclusion that the act forbidden, if performed, would constitute a violation of the law. Otherwise, the court would be enjoining the performance of a perfectly legal act, which the court is without authority to do.

If the law on which the injunction is based is legislatively created, then the legislature is likely also to have created rules regarding the means by which the law should be enforced and the appropriate sanction for a violation of the law. For instance, the harassing behavior of the hypothetical CEO in part I.B, *supra,* is illegal as a result of Section 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (1994). The procedure for enforcing Title VII is set forth in 42 U.S.C. § 2000e-5 (1994). Under that section, an employee alleging a Title VII violation must first file a charge with the Equal Employment Opportunity Commission ("EEOC"). If the EEOC decides not to bring a civil action against the employer, it must notify the aggrieved employee, who then has ninety days in which to bring a civil action on her own. *See* 42 U.S.C. § 2000e-5(f)(1). If the action is successful, the types of relief available to the employee are set forth in 42 U.S.C. § 2000e-5(g).[13]

Once the employee obtains an injunction that orders the employer to cease the harassment, however, she can completely circumvent the procedure prescribed by Congress. No notice to the EEOC is necessary; the employee need only request a show cause hearing from the court. If the employer is held in contempt, the court can respond with compensatory or punitive sanctions. *See supra* part I.B. If the court imposes compensatory sanctions, the limitations on relief found in 42 U.S.C. § 2000e-5(g) will be inapplicable.

---

[13]Section 2000e-5(g) specifically authorizes injunctive relief for violations of Title VII. This provision could conceivably be read as congressional authorization of injunctive relief regardless of whether the plaintiff has an adequate remedy at law. The more reasonable reading of the provision is that it means merely that injunctive relief is allowed when the traditional equitable requirements are met—including the absence of an adequate remedy at law. *See Sanchez v. Philip Morris Inc.,* 774 F.Supp. 626, 630-31 (W.D.Okla.1991) (denying an injunction in a Title VII case on the ground that the plaintiff's legal remedies are adequate); *cf. Hecht Co. v. Bowles,* 321 U.S. 321, 329-30, 64 S.Ct. 587, 591-92, 88 L.Ed. 754 (1944) (holding, in regard to a similar provision in the Emergency Price Control Act, that the traditional rules of equity still apply to the granting of injunctions). Even if I am mistaken in this view, however, this means merely that Title VII is an exception to the general rule (much like securities law, *see infra* note 18) and takes nothing away from the broader point being made in the text.

Furthermore, the employer will have no means of raising many of the defenses that would be available in an ordinary civil action, such as laches. If the court imposes punitive sanctions, it will have effectively made criminal conduct that Congress has not deemed criminal (in light of the absence of statutory criminal punishments for violations of Title VII). Even if Congress had done so, the enforcement of the criminal law would be a matter for the executive branch, not the judicial branch.[14] Thus, regardless of whether the injunction is enforced through compensatory or punitive sanctions, the court has intruded on the province of the legislative and executive branches by altering the congressionally-created procedures and remedies for sexual harassment.[15]

In sum, an injunction enforceable only through punitive or compensatory sanctions constitutes an individualized criminal or civil law (respectively). This new law is duplicative of the existing law but with a different enforcement mechanism—contempt proceedings—and thus creates an opportunity to use different procedures and to impose different sanctions from those contemplated by the legislature under the circumstances. Therefore, where the action being enjoined is a violation of statutory law, the entry of an injunction implicates the constitutional doctrine of separation of powers. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 n. 9, 110 S.Ct. 2510, 2517 n. 9, 110 L.Ed.2d 455 (1990) (noting that separation of powers requires "that Congress rather than the courts controls the availability of remedies for violations of statutes"); *cf. NLRB v. Express Pub. Co.,* 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941) (noting that, except where a specific violation has been found, "Congress did not contemplate that the courts should, by contempt proceedings, try alleged violations of the National Labor Relations Act").

E.

---

[14]This is one of the reasons for the equitable principle that equity will not enjoin the commission of a crime. *See* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2942, at 70-71 (2d ed.1995).

[15]The court could avoid this problem only by conducting a contempt proceeding that, in every relevant way, duplicated a criminal or civil trial.

In light of all I have just said, a few caveats are in order. First, I am not saying that punitive and compensatory contempt sanctions are never appropriate means for enforcing an injunction. For instance, if a party is enjoined to produce certain documents and then destroys those documents, coercive sanctions would no longer be available. Under those circumstances, a punitive contempt sanction would be an important means of vindicating the court's authority. The injunction nevertheless would have been appropriately entered, because coercive sanctions were a viable option at the time the injunction was entered and thus the injunction provided meaningful relief to the adverse party.

Second, a court may enter an injunction that is not enforceable through coercive contempt sanctions when the court enters the injunction in aid of its jurisdiction. For instance, if a government official is enjoined to perform a certain act, and another individual tries to prevent the official from performing the act, the court could issue an injunction commanding the individual to cease his interference. Such an injunction would be appropriate despite not being enforceable through coercive sanctions, because the injunction was not entered as a form of relief for a party to a lawsuit, and thus there is no issue as to whether that party would have an adequate remedy at law. *Cf.* 18 U.S.C. § 1509 (1994) (authorizing injunctive relief against persons who forcefully interfere with the performance of duties under a court order, regardless of whether the conduct enjoined is also independently criminal).

Finally, I am not denying the importance of the injunction in modern jurisprudence. The principles outlined above would have permitted, for instance, the use of the injunction in school desegregation cases. In such cases, the defendants were enjoined to undertake a specific, albeit complex, act: Create a unitary school system. Theoretically, the defendants could have been jailed until such time as they complied with

29

the court's mandate.[16]  Once the commanded act had been done, however, the court's mandate would have been fully obeyed and any contempt would have been purged.

F.

In conclusion, when a party seeks an injunction to create criminal and/or civil liability via the court's contempt powers, rather than to coerce an adverse party into taking an action required of it, that party is using the legal device of an injunction for a purpose for which it was not designed.[17]  *See Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) ("The historical injunctive process was designed to deter, not to punish.").  Such an injunction provides no relief for the plaintiff (or at least no relief that could not be obtained at law), and intrudes into areas constitutionally reserved for the legislative and executive branches.  Therefore, when a court is faced with a request for injunctive relief, it should consider how the requested injunction is to be enforced.  If the injunction cannot be enforced using coercive sanctions, then it should not be entered.[18]

_____

[16]The more common approach was to require school districts to submit to the court a plan for creating a unitary school system;  if the plan was approved by the court, the court would retain jurisdiction to see if implementation of the plan succeeded in fulfilling the court's mandate.  *See, e.g., Brown v. Board of Educ. of Topeka, Kan.,* 139 F.Supp. 468, 470 (D.Kan.1955).  When various obstacles prevented fulfillment of the mandate—for instance, outside interference or obstinacy by certain officials—courts often issued injunctions in aid of their jurisdiction (sometimes enforceable only through punitive contempt sanctions, as discussed *supra* ) to ensure compliance with their initial orders.

[17]Indeed, if such an action were taken by a plaintiff deliberately, it would likely amount to the tort of abuse of process.  *Cf. Dykes v. Hosemann,* 776 F.2d 942, 950 (11th Cir.1985) (Tjoflat, J., concurring in part and dissenting in part).

[18]An exception that proves the rule can be found in the area of securities law.  Most SEC enforcement actions are resolved by injunctions (entered pursuant to consent decrees) that order the defendant essentially to do nothing more than obey the securities laws.  *See, e.g., SEC v. Clifton,* 700 F.2d 744, 746 (D.C.Cir.1983).  These injunctions allow the SEC to punish repeat offenders without having to bring a separate lawsuit for each offense;  instead, the commission needs only to request a show cause hearing to obtain sanctions against the offender.  *See id.* at 748.  This practice is permissible, however, only because Congress has specifically authorized it in the Securities Act of 1933.  *See* 15 U.S.C. § 77t(b) (1994);  *SEC v. Jones,* 85 F.2d 17, 17 (2d Cir.1936) (noting that, because of the Securities Act, the SEC need not allege the absence of an adequate remedy at law when seeking injunctive relief).  This specific congressional authorization suggests that such a practice would be impermissible if not so authorized.

II.

The appellants in this case challenge two sets of provisions in the injunction entered by the district court. The first set of injunctive provisions enjoins the members of the DeKalb County Board of Education and the employees of the DeKalb County school system (such as principals and teachers) not to permit students to engage in various forms of religious activity.[19] For instance, the defendants were enjoined from "permitting ... vocal prayer; Bible and religious devotional or scriptural readings; distribution of religious materials, texts, or announcements; and discussions of a devotional/inspirational nature" in the DeKalb County schools. The defendants were also enjoined from "permitting ... prayers, invocations, benedictions, or devotional messages at graduation or commencement exercises." Similar provisions were included in regard to public-address systems and school-sponsored assemblies and events.

These provisions, for the reasons outlined in part I, were entered in error. It is clear that the provisions are not enforceable through coercive sanctions. For instance, assume that a DeKalb County school principal violates the injunction by "permitting" a student prayer at graduation.[20] Plaintiff Jesse Chandler is present at the graduation, and, after hearing the prayer, obtains a show cause hearing from the district court.[21]

---

[19]The members of the DeKalb County Board of Education (and their successors in office) are the defendants in the lawsuit. The injunction extends to the employees of the school system on the ground that they are "in active concert and participation with" the defendants.

[20]In addition to the problems with the injunction outlined above, the injunction's command that the defendants not "permit" certain activity is too vague to satisfy the requirements of Fed.R.Civ.P. 65(d). *See American Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1411 (11th Cir.1998); *Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1531 (11th Cir.1996). What exactly does it mean, for instance, for a principal to "permit" a prayer at a school's graduation? Does it mean merely that if he is aware that a student speaker is going to pray, then he must ask the student not to do so? Must he prevent the student from speaking altogether once he is aware that the student is inclined to pray? If a student speaker surprises the principal with a prayer at graduation, must he, at once, rush on stage and attempt physically to remove the student from the microphone? This vagueness makes it impossible for the defendants to know exactly what the injunction requires of them.

[21]The only plaintiffs in the case against the DeKalb County Board of Education are Michael Chandler and his son Jesse, a seventh-grade student in the DeKalb County school system. Michael Chandler appeared as "next friend" for his son.

At the hearing, the court holds the principal in contempt. In this situation, the harm sought to be prevented by the injunction—namely, the violation of Chandler's Establishment Clause rights[22]—would already have occurred, and the court could do no more than punish the principal for his contempt or attempt to compensate Chandler for the harm caused. The only form of coercive relief imaginable under the circumstances would consist of fining or imprisoning the principal until such time as the district court was convinced (presumably on the basis of nothing other than the principal's sincere-sounding promises) that he would not repeat the offense; even then, the coercive sanctions would not have provided Chandler with any relief because the harm would still be fully accomplished. *Cf. Gompers,* 221 U.S. at 442, 31 S.Ct. at 498. Thus, only punitive or compensatory sanctions would be available.

Insofar as the injunction would be enforced via punitive contempt sanctions, it would provide no direct relief to Chandler. The only benefit it would bring to Chandler would be a deterrent to the principal, one which would be equally available in an action for damages under 42 U.S.C. § 1983 (1994). Thus, the injunction, if enforced by punitive contempt sanctions, gives Chandler no better relief than that which he could obtain at law.

Furthermore, enforcing the injunction with punitive contempt sanctions would raise a separation-of-powers problem. A necessary prerequisite for the issuance of the injunction was the district court's conclusion that the behavior to be enjoined—for instance, permitting a prayer at graduation—would constitute a violation of Chandler's constitutional rights. Therefore, punitive sanctions in response to a violation of the injunction would in essence be punishment for violating Chandler's constitutional rights. The legislature, however, has already prescribed the appropriate criminal punishments for violations of constitutional rights in 18 U.S.C. § 242 (1994), which states that whoever, under color of law, "willfully subjects any person ... to the deprivation of any rights, privileges, or immunities secured or protected by the

---

[22]I seriously doubt, in light of the majority's analysis, that a principal who permits a prayer, without more, has violated a student's Establishment Clause rights. For purposes of my analysis, however, I will assume the correctness of the district court's conclusion to the contrary.

32

Constitution or laws of the United States ..., shall be fined under this title or imprisoned not more than one year, or both."[23]  The enforcement of this provision is the job of the executive branch, meaning that Congress has determined that the United States Attorney, not the judiciary, is to determine whether the principal should be prosecuted.  In such a prosecution, the full panoply of constitutional protections would apply, rather than the limited set that has been held to apply to the imposition of criminal contempt sanctions.  *See supra* note 4. Furthermore, in a criminal prosecution, the principal could raise the defense, based on the "fair warning" requirement of the Due Process Clause, that section 242 does not clearly prohibit "permitting" a prayer at graduation.  *See United States v. Lanier,* 520 U.S. 259, 267, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997) (discussing, in the context of a section 242 prosecution, the constitutional requirement that the statute under which the defendant is prosecuted must have "made it reasonably clear at the relevant time that the defendant's conduct was criminal").  Such a defense would be unlikely to be available in a contempt hearing, because the injunction—unlike the statute—explicitly prohibits this behavior.  In sum, criminal sanctions based on this injunction would constitute interference with the role of both the legislative and executive branches.[24]

---

[23]Conspiracies to violate this provision are outlawed by 18 U.S.C. § 241 (1994), which authorizes fines and imprisonment of up to ten years.  Thus, if the United States Attorney could demonstrate that the principal conspired with, for instance, one or more members of the DeKalb County Board of Education to permit the prayer, it could obtain convictions under section 241 in addition to section 242.

[24]Congress has responded to this problem to some degree in 18 U.S.C. § 402 (1994), titled, "Contempts constituting crimes."  Under that section, where conduct constituting contempt of a district court order also constitutes a crime under federal or state law, the alleged contemnor is entitled to a trial by jury.  Furthermore, the contemnor cannot be sentenced to more than six months imprisonment and cannot be assessed a punitive fine of more than $1,000.

> One could contend that this statute implicitly authorizes the sort of "end run" around criminal procedure that I am attacking, and thus eliminates any separation-of-powers problem.  After all, why would Congress pass a law prescribing procedures and penalties for contempts constituting crimes if it did not consider injunctions necessarily leading to such contempts (if disobeyed) to be acceptable?

> A look at the legislative history of section 402 dispels this contention.  Section 402 was passed in 1914 to prevent the abuse of labor injunctions.  Congress was concerned that

Insofar as this injunction would be enforced via compensatory contempt sanctions, it would merely be imitating the relief available to Chandler under 42 U.S.C. § 1983. Again, as with punitive sanctions, the injunction would give Chandler no relief different from that which he could obtain at law.[25]

It would, however, provide that relief in a manner contrary to that which Congress contemplated in enacting section 1983, again creating a separation-of-powers problem.[26] For instance, in a section 1983

corporations were obtaining injunctions forbidding certain union activity; these injunctions were then enforced through summary contempt proceedings. (The constitutional protections that are now available in criminal contempt proceedings, *see supra* note 4, were not available at that time.) The result was the imposition of penalties for violations of the criminal law, but without the benefit of a jury trial. Section 402 was intended to minimize this problem. *See United States v. Pyle,* 518 F.Supp. 139, 152 (E.D.Pa.1981) (discussing legislative history); 48 Cong. Rec. 8778 (1912) ("The courts have, under the guise of contempt of court, had men arrested and tried for crimes without the intervention of a jury." (statement of Rep. Clayton)).

In light of this legislative history, it is difficult to read section 402 as Congress' stamp of approval on injunctions enforceable only through punitive (or compensatory) sanctions. On the contrary, section 402 arises out of disapproval of such injunctions. *See id.* at 8779 ("This bill is to prevent a man or, say, a corporation, rich and powerful, getting out a blanket injunction at midnight, broad as the canopy of heaven in its terms, and then oppressing the poor, humble laborer." (statement of Rep. Clayton)). The fact that Congress chose to address the problem by limiting the damage at the back end (when contempt sanctions are imposed) in no way implies approval of the practice at the front end (when the injunction is issued). *Cf. id.* at 8798 (quoting statement of Rep. Sabath that the bill is not as broad as it should be, but is a step in the right direction).

Furthermore, had Congress intended so radical a move as to abolish completely the longstanding equitable principle that equity will not enjoin a crime, *see supra* note 14, it surely would have said something to indicate such an intent. *Cf. Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) ("We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made."). Nothing in the legislative history suggests that this is the case.

[25]The fact that exhaustion of state remedies is not required in section 1983 actions does not alter the requirement that a plaintiff seeking injunctive relief on the basis of section 1983 must demonstrate the absence of an adequate remedy at law. *See Wallace v. Kern,* 520 F.2d 400, 407 n. 13 (2d Cir.1975).

[26]This problem might not arise if the alleged violation of Establishment Clause rights was caused by a federal, rather than a state, official. Under those circumstances, the congressionally-created remedial scheme of section 1983 would be inapplicable, and a judicially-created remedial scheme based on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which a cause of action is implied from the Constitution, would apply. (The

proceeding, the principal would be entitled to a trial by jury; this right is not guaranteed in a civil contempt proceeding. Furthermore, in an ordinary section 1983 suit, the principal could respond to the complaint with a motion to dismiss for failure to state a claim. If that failed, the principal could assert a defense of qualified immunity, on the ground that liability for "permitting" a prayer at graduation is not clearly established by Supreme Court or Eleventh Circuit precedent.[27] Neither of these responses is generally available in a civil contempt proceeding. Thus, unless the show cause hearing were in effect transformed into a new section 1983 suit—with a jury trial, the opportunity to raise defenses, and so forth—the court would be violating the doctrine of separation of powers.

The second set of provisions challenged by the appellants, unlike the first set, was perfectly appropriate for inclusion in an injunction. Those provisions relate to the district court's command that the defendants (in conjunction with the plaintiffs) nominate three individuals, one of whom would serve as a monitor for the purpose of ensuring compliance with the injunction. This is a discrete act that, if not taken, could be compelled through coercive contempt sanctions (for instance, a fine of $100 for each day after the deadline that the list of individuals was not submitted). It was therefore properly the subject of an injunction.[28]

---

adequate-remedy-at-law problem would of course remain.) In this case, however, Congress has created a remedial scheme for the constitutional violation (section 1983) and therefore, in the absence of a showing that the congressional scheme is inadequate, the courts are to defer to Congress. *See McCarthy v. Madigan,* 503 U.S. 140, 151, 112 S.Ct. 1081, 1090, 117 L.Ed.2d 291 (1992).

[27]"[T]he qualified immunity test is simply the adaptation of the fair warning standard [from criminal law] to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes." *Lanier,* 520 U.S. at 270-71, 117 S.Ct. at 1227.

[28]The unchallenged portions of the injunction are a mix of proper and improper provisions. For instance, in addition to enjoining the defendants from "permitting" certain religious activities, it also enjoins them from "aiding, abetting, commanding, counseling, inducing, ordering, procuring, or otherwise participating in" those activities. Regardless of which gerund is chosen, these injunctive provisions still forbid the performance of an act, and are therefore inappropriate. Other provisions, however, enjoin the defendants to promulgate a written policy relating to religious activity in schools, to provide the Gideons with a copy of the injunction, and to conduct a training session to instruct faculty and administrators

In conclusion, the first set of injunctive provisions challenged by the appellants are enforceable only through punitive or compensatory contempt sanctions. They consequently raise all of the problems discussed in part I, and therefore must be vacated. The second set of provisions, however, raise none of those problems, and, for the reasons stated in the majority opinion, should be affirmed.

### III.

The injunction is an important remedial tool, but also one that has been greatly abused. By using an injunction as an alternative means of creating criminal and/or civil liability, courts ignore fundamental equitable and constitutional principles. Certain injunctive provisions at issue in this appeal illustrate this problem. I therefore concur in the majority opinion.

---

regarding the Establishment Clause and the Free Exercise Clause. These provisions command the performance of specific acts, and are thus, at least in form, perfectly legitimate.